# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
## NO. 03-04-00748-CV
---

**Gene Ennis, Appellant**

**v.**

**Robert Loiseau, Special Deputy Receiver of American Benefit Plans, et. al., Appellee**

---
### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT
### NO. GN304388, HONORABLE DARLENE BYRNE, JUDGE PRESIDING
---

### O P I N I O N

After being appointed by the Texas Insurance Commissioner to serve as a Special Deputy Receiver for a conglomerate of entities[1] accused of participating in a multi-state scheme of insurance fraud, appellee Robert Loiseau brought suit, as the assignee of the victims' claims, to liquidate and collect the entities' assets on behalf of the victims. Among the 140 defendants sued

---

[1] Appellee is the Special Deputy Receiver for the following entities: American Benefit Plans; National Association of Working Americans a/k/a National Association for Working Americans; United Employers Voluntary Employees Beneficiary Association; United Employers Voluntary Employees Beneficiary Association I; Electronic Benefits Group, Inc.; Enhanced Health Management, Inc.; Four Corners Company, LLC a/k/a Four Corners Co. LLC, a/k/a Four Corners Corp.; American Association of Agriculture, Forestry and Fishing Workers; American Association of Transportation, Communication, Electrical, Gas and Sanitary Workers; American Association of Wholesale Trade Workers; American Association of Manufacturer Workers; American Association of Service Workers; American Association of Construction Workers; and American Association of Professional Workers.

in the receivership action, Gene Ennis was named in his individual capacity as a "general agent," and two companies for which Ennis is president, Fidelity Benefit Administrators and NetPay USA, were named as corporate defendants. Ennis filed a special appearance, which was denied. He appeals, claiming in four issues that the trial court erred by denying his special appearance, admitting certain affidavits and exhibits offered by Loiseau, sustaining objections to Ennis's affidavit, and failing to enter findings of fact and conclusions of law. Because the evidence in the record is legally and factually sufficient to support the trial court's denial of Ennis's special appearance and no reversible error was committed, we affirm the trial court's order.

## BACKGROUND

In 2002, the State of Texas began the process of shutting down a multi-state network of fraudulent insurers based in Fort Worth and primarily operated by Fort Worth resident Robert David Neal and his companies, American Benefit Plans (ABP), United Employers Voluntary Employees Beneficiary Association (UEVEBA), and National Association of Working Americans (NAWA). In May 2002, a final judgment and a permanent injunction were entered against many of the fraudulent insurers and Loiseau was appointed as the Special Deputy Receiver. The receiver took over and ceased all operations at Neal's Fort Worth offices. Thereafter, hundreds of victims of the scheme assigned their claims to Loiseau, and he filed the underlying receivership action to liquidate and collect the assets on their behalf.

Gene Ennis, Fidelity Benefit Administrators, and NetPay USA were three of the defendants sued in the receivership action. Ennis is a Florida resident and is president of Fidelity and NetPay, both of which are incorporated in Florida. Loiseau's petition named Ennis as a

2

"General Agent who engages in business in the State of Texas" and claimed that, despite the duties of care owed to "the employers, employee groups, enrollees, and insureds that purchased health insurance plans marketed by ABP, *et al.*," many general agents operated without a license and all "negligently failed to use due diligence to determine whether the ABP programs were properly authorized and licensed," including the "fail[ure] to discover, through readily available open records, that ABP/NAWA was not licensed, that Robert David Neal was subject to numerous complaints," and "the true nature of any alleged reinsurance or other financial backing for the programs." Loiseau further alleged that each of the defendants "committed torts in the State of Texas and entered into contracts with one or more of the Receivership Defendants in the State of Texas" and profited from its involvement in the insurance scheme to the detriment of Texas and its residents. Finally, Loiseau asserted that there were "numerous communications between the Defendants in this case and the ABP/NAWA headquarters in Texas by way of telephone, fax, United States Postal Service, internet, and overnight courier services." Based on these allegations, Loiseau asserted that the defendants were subject to personal jurisdiction in Texas and were liable for negligence, gross negligence, negligent misrepresentation, conspiracy, violation of Texas Insurance Code section 101.201,[2] and breach of fiduciary duty. Loiseau also sought disgorgement and exemplary damages, asserting that "the defendants had and/or should have had actual, subjective awareness of the risk involved, but proceeded with conscious indifference to the rights, safety, or welfare of others."

---

[2] Section 101.201(a) states that "[a]n insurance contract effective in this state and entered into by an unauthorized insurer is unenforceable by the insurer. A person who in any manner assisted directly or indirectly in the procurement of the contract is liable to the insured for the full amount of a claim or loss under the terms of the contract if the unauthorized insurer fails to pay the claim or loss." Tex. Ins. Code Ann. § 101.201(a) (West Supp. 2004-05).

3

In response, Ennis and NetPay specially appeared. Fidelity did not challenge the court's jurisdiction. Ennis invoked the fiduciary shield doctrine by challenging that Texas lacked personal jurisdiction over him *as an individual* because all of his contacts with the state were performed in his corporate capacity as the president of Fidelity and NetPay. Ennis asserted that the jurisdictional pleadings were insufficient because they only named Ennis as an individual, while all of the receiver's evidence pertained to Ennis's corporate capacity, and because the pleadings did not establish alter ego or allege a cause of action for which Ennis could be held personally liable. However, Ennis acknowledged that he was the "man in charge" of both Fidelity and NetPay; he did not dispute the substantial connections between Fidelity and Texas-based Neal, ABP, UEVEBA, and NAWA; and he agreed that NetPay contracted with NAWA, collected funds from Texas employers to support a carrier that insured Texas employees, and sold insurance documents to Texas employers via its website. Loiseau contended that the evidence established "abundant" contacts made by Ennis as the agent of Fidelity and NetPay and argued that Ennis was not shielded from personal jurisdiction simply by wearing his "president of Fidelity hat" while committing torts and engaging in a conspiracy to defraud Texas consumers.

The trial court denied the special appearances. Ennis requested that the trial court issue findings of fact and conclusions of law, but the court declined to do so, stating that "[b]ased on this short evidentiary hearing, the Court finds that Findings of Fact would be unnecessary in this case." NetPay did not challenge the denial of its special appearance. Ennis filed this interlocutory appeal, claiming that it is not appropriate to exercise jurisdiction over him as an individual because he is protected by the fiduciary shield doctrine, and that the trial court also committed reversible

4

error by admitting evidence that was untimely offered by Loiseau, by sustaining Loiseau's objections to Ennis's affidavit, and by not issuing findings of fact and conclusions of law.

## ANALYSIS

**Evidentiary Challenges**

As an initial matter, we address Ennis's second and third issues, in which he asserts two evidentiary errors pursuant to Rule 120a: He claims that the trial court erred in admitting affidavits and exhibits that were untimely filed by Loiseau and in sustaining Loiseau's objections to portions of Ennis's affidavits. *See* Tex. R. Civ. P. 120a(3). We address these claims initially because Ennis's primary issue on appeal, whether he is subject to personal jurisdiction in Texas, relies in part on the contested evidence.

In support of his challenge to Ennis's special appearance, Loiseau offered seventy affidavits at the special appearance hearing; each affidavit was attested to by Loiseau, as the Special Deputy Receiver on behalf of Texas Insurance Commissioner Jose Montemayor, and each certified that the attached records were held by Loiseau "in the course of delinquency proceedings against American Benefit Plans, *et. al.*" Ennis asserts that, because Loiseau did not provide copies to him until the day before the hearing, they were untimely filed and the trial court should have excluded them based on the requirement that, in a special appearance, "affidavits, if any, shall be served at least seven days before the hearing." *Id*.

At the hearing, Ennis objected by saying, "Your Honor, I'd like to address for a few minutes the response that [Loiseau] made to—in opposition to Gene Ennis's special appearance, and I'd like to object because it's not very—it's not timely, just last evening at 4:30 or so. But speaking

5

to its content . . . ." Ennis then continued with a lengthy challenge to the substance of the evidence; he never returned to the timeliness issue and never obtained a ruling, express or implied, on that objection. In order to preserve error for appeal, a party must make a timely objection "with sufficient specificity to make the trial court aware of the complaint" and obtain a ruling on the record. Tex. R. App. P. 33.1. Because Ennis failed to preserve error on whether Loiseau's exhibits were timely filed under Rule 120a(3), the seventy exhibits offered by Loiseau may be properly relied on as support for subjecting Ennis to personal jurisdiction. Ennis's second issue is overruled.

Ennis also claims that the trial court erred by sustaining Loiseau's objections that portions of Ennis's affidavit and supplemental affidavit were conclusory. The trial court sustained objections to the following statements, thereby excluding them as evidence to be considered in determining the special appearance:

- As an individual, I do not have any substantial connection with Texas arising from any of my actions or conduct purposefully directed toward Texas.

- The Plaintiffs' claims do not arise from and are not related to any activity conducted by me as an individual in Texas.

- As an individual, I do not have any continuing or systematic contacts with Texas.

- As an individual . . . [I have not] committed any tort, in whole or in part, within the state.

Rule 120a(3) states that affidavits offered in a special appearance "shall be made on personal knowledge [and] shall set forth specific facts as would be admissible in evidence." Tex. R. Civ. P. 120a(3). Further, special appearance affidavits must be "direct, unmistakable, and unequivocal as

6

to the facts sworn to." *Wright v. Sage Eng'g, Inc.,* 137 S.W.3d 238, 250 n.8 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (nonresident's statement that he had committed no torts in Texas was properly excluded as conclusory).

Here, the trial court overruled objections to portions of Ennis's affidavits that contained factual information and only sustained objections to the above statements, which were legal conclusions and did not set forth specific facts. In his brief, Ennis agrees that these statements were conclusory, but claims they "had to be conclusory to some extent in the absence of allegations of specific facts by the plaintiff." Because Loiseau satisfied his pleading burden, this claim does not justify the conclusory nature of Ennis's affidavits. Thus, the trial court did not err in excluding the conclusory portions of Ennis's affidavits, and we do not consider those statements in weighing the sufficiency of the evidence. In any event, even if we were to consider the contested portions of Ennis's affidavit, it would not alter our conclusion. Ennis's third issue is overruled.

**Personal Jurisdiction**

In his first issue, Ennis challenges the court's exercise of jurisdiction over him, asserting that the receiver failed to plead sufficient jurisdictional facts, that he satisfied his burden of negating the bases of jurisdiction pled, and that the evidence does not show that he, as an individual, purposefully established minimum contacts with Texas. Loiseau counters that, by not filing a motion to quash, Ennis failed to preserve error on the sufficiency of Loiseau's pleadings. Loiseau further asserts that the record evidence supports subjecting Ennis, individually as an agent of Fidelity and NetPay, to specific jurisdiction in Texas; Loiseau does not contend that Ennis should be subjected to general jurisdiction.

*Motion to Quash*

In attempting to subject a nonresident defendant to jurisdiction in Texas, the plaintiff bears the initial burden of pleading sufficient allegations to satisfy the Texas long-arm statute. *BMC Software Belgium, N.V. v. Marchland*, 83 S.W.3d 789, 793 (Tex. 2001); *see* Tex. Civ. Prac. & Rem. Code Ann. § 17.042 (West 1997) (jurisdiction proper upon showing that defendant is "doing business" in Texas, which includes entering contract with Texas resident and committing tort within Texas). The burden then shifts to the defendant to affirmatively negate all bases of jurisdiction asserted by the plaintiff. Tex. R. Civ. P. 120a; *BMC Software*, 83 S.W.3d at 793. Loiseau asserts that, because Ennis did not file a motion to quash, Ennis waived his complaint that the "[p]laintiff failed to allege the necessary minimum contacts . . . to bring [Ennis] under the jurisdiction of a Texas court." Loiseau bases this claim on language in *Kawasaki Steel Corp. v. Middelton* stating that "defective jurisdictional allegations in the petition . . . must be challenged by a motion to quash, not a special appearance." 699 S.W.2d 199, 203 (Tex. 1985).

However, reading *Kawasaki* as a whole, it is clear that the supreme court required a motion to quash only for the purpose of challenging curable, procedural defects with the service of process. *Id*. at 202 (motion to quash required to challenge such things as failure to serve defendant or defect in citation). The Court explained that the "jurisdictional facts" to be challenged with a motion to quash are those allegations "required for service under the long-arm statute" concerning why the secretary of state is an appropriate substituted agent for serving process on a nonresident defendant. *Id*. at 202; *see also* Tex. Civ. Prac. & Rem. Code Ann. § 17.044 (West 1997) (*cited in Kawasaki* as "article 2031(b), R.C.S.").

8

Facts regarding the service of process, which are properly challenged with a motion to quash, are distinguishable from jurisdictional allegations establishing that the nonresident is amenable to personal jurisdiction based on his minimum contacts with this state. If a defendant wishes to challenge jurisdictional pleadings "on the ground that such party or property is not amenable to process issued by the courts of this State," then his proper tool is a special appearance. *Compare* Tex. R. Civ. P. 122 (motion to quash), *with id.* 120a (special appearance). The *Kawasaki* court recognized this distinction: "A curable defect in service of process does not affect a nonresident defendant's amenability to service of process." 699 S.W.2d at 202. The distinction is based on the cures available from each motion. *Id.*; *Wright,* 137 S.W.3d at 245-46. Because a citation error is procedural and curable, the remedy provided by a motion to quash is additional time for the defendant to answer. *Kawasaki Steel Corp.*, 699 S.W.2d at 202. However, a substantive defect in the pleading is not curable and, thus, the remedy for a defendant's special appearance is dismissal from suit. *Id.*

Accordingly, nonresidents routinely file special appearances to challenge jurisdiction; it follows that a special appearance is the proper method for a nonresident defendant to assert that, based on the capacity in which he was sued, the plaintiff failed to allege sufficient minimum contacts between the defendant and Texas to establish his amenability of process in this state. *See Morris v. Powell*, 150 S.W.3d 212, 221 (Tex. App.—San Antonio 2004, no pet.) (nonresidents filed special appearance to assert that plaintiff's allegations were insufficient to establish jurisdiction over them individually because all contacts were made in corporate capacity); *Brown v. General Brick Sales Co., Inc.*, 39 S.W.3d 291, 293 (Tex. App.—Fort Worth 2001, no pet.) (same). Ennis does not

complain of any error regarding the service of process. Rather, he raises a standard special appearance challenge, asserting that the plaintiff failed to establish proof of minimum contacts between himself, in his individual capacity, and the forum. Ennis, therefore, did not waive his first issue by raising it in a special appearance rather than a motion to quash.

Although Ennis preserved his challenge that Loiseau failed to plead a sufficient basis for subjecting him to personal jurisdiction, this does not provide grounds for reversal because Loiseau satisfied his burden. The plaintiff's original pleadings as well as its response to the defendant's special appearance can be considered in determining whether the plaintiff satisfied its burden. *Wright,* 137 S.W.3d at 249 n.7. Rule 120a also states that, in determining whether the special appearance should be granted or denied, courts may consider evidence from "the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony." Tex. R. Civ. P. 120a(3); *see also Gutierrez v. Deloitte & Touche*, 100 S.W.3d 261, 273 (Tex. App.—San Antonio 2002, pet. dism'd).

Loiseau's pleadings alleged that, as a general agent, Ennis engaged in business and committed torts in the State of Texas; entered into contracts with Texas entities; communicated via facsimile, telephone, and e-mail with Texas entities; and profited from his involvement with these entities, to the detriment of Texas residents. The pleadings also set forth specific allegations concerning how Ennis, as a general agent, had been negligent and breached his fiduciary duty. Loiseau also filed a response to Ennis's special appearance, further detailing why the court had personal jurisdiction over Ennis as an individual. He alleged that Ennis may be held personally liable for playing a "key role in the creation, marketing, and administration of the bogus health

10

plans," provided a specific list of activities demonstrating Ennis's participation in the fraudulent scheme, explained why Ennis's corporate capacity did not shield him from jurisdiction, and offered proof that Ennis was aware that Fort Worth was the home base of the fraudulent programs. Seventy-six exhibits were admitted in support of Loiseau's response.

Loiseau, therefore, satisfied his initial burden of pleading a sufficient basis upon which to subject Ennis to personal jurisdiction. To avoid litigating in Texas, it was then Ennis's burden to negate Loiseau's pleadings. After the special appearance hearing, the trial court determined that Ennis failed to do so. We now review that determination.

### *Standard of Review*

A trial court's order granting or denying the special appearance is subject to an interlocutory appeal in which we review *de novo* the legal question of whether a Texas court can properly exercise personal jurisdiction over the nonresident defendant. Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7) (West Supp. 2004-05); *BMC Software*, 83 S.W.3d at 794. Questions of fact must frequently be resolved by the trial court before reaching the jurisdictional inquiry. *Id.* While a special appearance is not the appropriate stage to make a determination on liability, we must consider facts regarding the defendant's actions that could foreseeably cause harm in Texas in order to determine whether the defendant should have anticipated being haled into a Texas court. *Wright,* 137 S.W.3d at 251.

If the trial court denied the special appearance without delineating findings of fact and conclusions of law, all facts necessary to support the order are implied in its favor, if they are

supported by the record.[3] *BMC Software*, 83 S.W.3d at 795. When a clerk's and reporter's record are included on appeal, as here, these implied findings may be challenged for both legal and factual sufficiency. *Id.* In determining whether the evidence is sufficient to support a trial court's factual determinations, we consider the entire record and conduct an ordinary sufficiency review. *French v. Glorioso*, 94 S.W.3d 739, 744 (Tex. App.—San Antonio 2002, no pet.). We will set aside a trial court's implied finding only if it is so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust. *Id.* The trial court, as the fact-finder, is the sole arbiter of the witnesses' credibility and the weight that their testimony should be afforded. *Wyatt v. Wyatt*, 104 S.W.3d 337, 340 (Tex. App.—Dallas 2003, no pet.). This Court will not disturb a trial court's resolution of conflicting evidence that turns on the credibility or weight of the evidence. *Benoit v. Wilson*, 239 S.W.2d 792, 796 (Tex. 1951).

### Minimum Contacts and the Fiduciary Shield Doctrine

A Texas court may exercise personal jurisdiction over a nonresident defendant if it is authorized by the Texas long-arm statute and if it comports with the constitutional guarantees of due process. *Schlobohm v. Schapiro*, 784 S.W.2d 355, 356 (Tex. 1990); *see* Tex. Civ. Prac. & Rem. Code Ann. § 17.042 (West 1997). The broad language of the Texas statute allows it to reach as far

---

[3] Ennis asserts, without citing any authority, that "no facts should be implied in favor of the trial court's judgment" when a clerk's and reporter's record are provided. This is contrary to well-established precedent that such facts should be implied. *See*, *e.g.*, *Sixth RMA Partners, L.P. v. Sibley*, 111 S.W.3d 46, 52 (Tex. 2003); *Tempest Broad. Corp. v. Imlay*, 150 S.W.3d 861, 867-68 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (rejecting defendant's argument in special appearance case that, because findings were properly requested yet not issued, a less deferential standard of review should be applied to implied findings); *Smith v. Lanier*, 998 S.W.2d 324, 329-30 (Tex. App.—Austin 1999, pet. denied).

as the federal Constitution permits and thus the due process analysis under state law is consistent with the federal test. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991). Accordingly, a three-prong test must be satisfied in order to subject a nonresident defendant to personal jurisdiction in Texas: (i) the defendant must establish minimum contacts by purposefully doing some act or consummating some transaction in the forum state; (ii) the cause of action must arise from or be connected with such act or transaction, as to support specific jurisdiction, or the defendant's contacts with Texas must be continuing and systematic, as to support general jurisdiction; and (iii) the assumption of jurisdiction by the forum state must not offend traditional notions of fair play and substantial justice. *Schlobohm,* 784 S.W.2d at 358.

Ennis claims that any contacts he purposefully directed at Texas were performed in his corporate capacity and, thus, pursuant to the fiduciary shield doctrine, it is inappropriate for a Texas court to exercise jurisdiction over him as an individual.[4] We need not determine whether the fiduciary shield doctrine should be adopted in this case, however, because the courts that have

---

[4] *See SITQ E.U., Inc. v. Reata Rest., Inc.,* 111 S.W.3d 638, 651 (Tex. App.—Fort Worth 2003, pet. denied) (fiduciary shield protects corporate officer, individually, from general jurisdiction if all contacts made in corporate capacity, unless alter ego is proven)*; see also*, *Morris v. Powell*, 150 S.W.3d 212, 221 (Tex. App.—San Antonio 2004, no pet.); *Wright v. Sage Eng'g, Inc.,* 137 S.W.3d 238, 250 & n.9 (Tex. App.—Houston [1st Dist.] 2004, pet. denied); *Jackson v. Kincaid*, 122 S.W.3d 440, 448 (Tex. App.—Corpus Christi 2003, pet. granted); *D.H. Blair Inv. Banking Corp. v. Reardon*, 97 S.W.3d 269, 277 (Tex. App.—Houston [14th Dist.] 2002, pet. dism'd w.o.j.); *Tuscano v. Osterburg*, 82 S.W.3d 457, 467 (Tex. App.—El Paso 2002, no pet.). Although not formally adopted by the supreme court, the doctrine is consistent with the court's language in *Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 437-38 (Tex. 1982) (can impute individual liability to corporate officers upon proof of alter ego), and with the Supreme Court's holding in *Calder v. Jones*, 465 U.S. 783, 790 (1984) (jurisdiction proper over corporate officers, individually, because they were "primary participators in an alleged wrongdoing intentionally directed at" forum state).

13

adopted it have expressly limited its application to *general* jurisdiction, and Loiseau does not assert that Ennis should be subjected to general jurisdiction. *See, e.g., Wright*, 137 S.W.3d at 250.

Even if the fiduciary shield were adopted by this Court, it would not protect Ennis from the exercise of *specific* jurisdiction. Courts recognize that a corporate officer is not protected from the exercise of specific jurisdiction, even if all of his contacts were performed in a corporate capacity, if the officer engaged in tortious or fraudulent conduct, directed at the forum state, for which he may be held personally liable. *Id.*; *see SITQ E.U., Inc. v. Reata Rest., Inc.,* 111 S.W.3d 638, 651 (Tex. App.—Fort Worth 2003, pet. denied); *see also Morris v. Kohls-York*, No. 03-04-00371-CV, slip op. at __ (Tex. App.—Austin May 5, 2005, no pet. h.). This rule is not based on an exception to the fiduciary shield doctrine, but rather on the well-established principal that "a corporate officer is primarily liable for his own torts." *Morris,*150 S.W.3d at 219, 221 (specific jurisdiction satisfied based on allegations that officers committed negligence, fraud, and/or negligent misrepresentation in carrying out corporate activities). One's "status as an employee does not somehow insulate [him] from jurisdiction" and "there is no blanket protection from jurisdiction simply because a defendant's alleged acts were done in a corporate capacity." *Calder v. Jones*, 465 U.S. 783, 790 (1984); *SITQ E.U., Inc.,* 111 S.W.3d at 651. A corporate officer may not escape liability where he had direct, personal participation in the wrongdoing, as to be the "'guiding spirit' behind the wrongful conduct" or the "'central figure' in the challenged corporate activity." *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 174 (5th Cir. 1985) (citations omitted). Hence, "[i]t is the general rule in Texas that corporate agents are individually liable for fraudulent or tortious acts committed while in the service of their corporation." *Shapolsky v. Brewton*, 56 S.W.3d 120, 133 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

14

Citing *Wright v. Sage Engineering*, Ennis asserts that, in order to exercise specific jurisdiction over a nonresident corporate officer, the plaintiff must produce evidence of an *intentional* tort or fraud committed by the officer. *See* 137 S.W.3d at 250 (corporate officer not protected "from specific personal jurisdiction as to intentional torts or fraudulent acts for which he may be held individually liable"). It is true that an officer is not protected from specific jurisdiction if he has committed an intentional tort; yet, *Wright* does not stand for the proposition that specific jurisdiction can only be exercised over the corporate officer upon proof of an intentional tort. As noted in *Wright*, the key to subjecting an individual officer to specific jurisdiction is *whether he may be held individually liable* for those actions constituting minimum contacts with the forum, even if the actions were performed in his corporate capacity. *Id.* at 250-51 (because corporate officer could be individually liable for misrepresentations made as corporate representative, specific jurisdiction was proper over him in individual capacity). The court in *Wright* relied on cases that do not require proof of an intentional tort in order to exercise specific jurisdiction over corporate officers. *See, e.g., Jackson v. Kincaid,* 122 S.W.3d 440, 448 (Tex. App.—Corpus Christi 2003, pet. granted) (holding that is was proper to subject defendant-attorneys to specific jurisdiction based on proof that they had appeared *pro hac vice* in a Texas court, for which they could be individually liable, without stating that their actions were intentionally tortious or fraudulent); *Shapolsky*, 56 S.W.3d at 133-34 (specific jurisdiction appropriate over individual officer based on fraudulent misrepresentations made in corporate capacity); *General Elec. v. Brown & Ross Int'l Distribs., Inc.*, 804 S.W.2d 527, 532-33 (Tex. App.—Houston [1st Dist.] 1990, writ denied) (allegations of bribery and conspiracy sufficient evidence of "tortious activity" to support exercise of specific jurisdiction over corporate officer); *see also Morris,* 150 S.W.3d at 219, 221 (specific jurisdiction can be asserted over individual officer

based on "torts for which the employee may be individually liable," without requiring that the torts be intentionally committed, because "a corporate officer is primarily liable for his own torts"). Moreover, the Fort Worth court has stated that a corporate officer is not protected from specific jurisdiction if the officer performed *any* action for which he may be individually liable, including unintentional torts. *SITQ E.U., Inc.,* 111 S.W.3d at 651.

We agree with our sister courts that it is not necessary to prove that the corporate officer engaged in intentionally tortious activity to subject him to specific jurisdiction; rather, the plaintiff must establish that the officer committed fraudulent or tortious acts for which he may be held individually liable. In any event, there is sufficient evidence in the record to support the trial court's implied finding that Ennis engaged in intentionally tortious or fraudulent activity for which he may be personally liable.

Because "ultimate liability in tort is not a jurisdictional fact, and the merits of the cause are not at issue," our jurisdictional inquiry focuses on whether Loiseau sufficiently established facts suggesting that Ennis should have anticipated being haled into a Texas court based on his actions. *Wright*, 137 S.W.3d at 251; *French,* 94 S.W.3d at 743-44 (jurisdictional determination only requires sufficient evidence to support implied findings that suggest, but do not ultimately prove, liability). Hence, if the evidence suggests that the nonresident officer participated in tortious or fraudulent activities, which were directed at Texas and for which he may be held personally liable, then there is a sufficient basis to assert specific jurisdiction over him. *Wright*, 137 S.W.3d at 251.

Ennis agrees that substantial connections exist between his companies—Fidelity and NetPay—and the Texas-based companies run by Neal that comprised the nucleus of the fraudulent insurance scheme—ABP, UEVEBA, and NAWA. Ennis testified that Fidelity hired Neal as a

16

consultant and used his services to develop and sell three "limited benefit plans with a reduced prescription benefit," and that both Fidelity and NetPay used UEVEBA as a "funding mechanism." In connection with these arrangements, Ennis signed an "administrative and service agreement" on behalf of Fidelity identifying services Fidelity would provide to UEVEBA in exchange for a fee of 20% of all contributions collected. Ennis also testified about the "bank draft authorization" contract between Fidelity and NAWA: individual employees who were members of NAWA would enroll in the ABP program and provide preauthorized bank drafts so that their monthly contributions could be automatically deducted from their checking accounts. The record contains copies of many of these preauthorized checks, evidencing that several of the participating employees were Texas residents. Fidelity then processed these automated transactions; wired a portion of the money to a bank account that was co-signed by NAWA, Neal, and Fidelity; and kept a percentage of the monthly contribution as its fee. Fidelity sent a letter to all participating employees, including those in Texas, stating that ABP had contracted with Fidelity to handle the automated monthly payments. Ennis testified that he understood Neal was responsible for distributing the wired money to the reinsurance carriers, but that at some point Neal began to fraudulently divert these funds.[5]

Ennis further testified that he was the "man in charge" of Fidelity and NetPay, that he was the "ultimate person in charge of putting together and finalizing the UEVEBA-related programs," and that, as president, it was his responsibility to be aware of and authorize all activities

---

[5] Ennis claims that he stopped wiring money to the NAWA account as soon as he discovered this fraudulent activity, which he states did not happen until February 25, 2002. However, Ennis acknowledged in his deposition that, prior to that date, he was aware that both he and Neal were under investigation by insurance regulators. Even with this knowledge, Ennis continued to wire money to the NAWA account and otherwise transact business with Neal.

17

that his company engaged in with Neal or his entities. As such, Ennis signed several contracts establishing relations between his and Neal's companies and frequently communicated with Neal. Ennis testified about numerous e-mails, facsimiles, and telephone calls that he directed to Neal in Texas. Loiseau testified that this "raft of correspondence" shows Ennis and Neal to "clearly [be] on a first-name basis, writing in a very personal, familiar tone." Additionally, Ennis testified that he traveled to Texas to meet with Neal about the business deals between their various companies.

Ennis disputes that he knew he was directing his actions toward Texas; he claims that he believed UEVEBA was a California company with a Nevada domicile. Contrary to Ennis's claim, however, the record establishes his knowledge that he was dealing with a Texas resident and Texas-based companies. Ennis acknowledged that he traveled to Texas to meet with Neal, entered a contract with UEVEBA listing its address as located in Fort Worth, signed a document stating that all UEVEBA notices from Fidelity should be directed to Neal in Fort Worth, and communicated with Neal and several employees of Neal's companies in Fort Worth.

Regardless of whether Ennis is ultimately held liable for the actions he performed in connection with Neal, ABP, UEVEBA, and NAWA, the evidence presented in the context of the special appearance—primarily from Ennis's own testimony—suggests that Ennis participated in a fraudulent scheme, operating out of Texas, for which he may be held personally responsible. Ennis acknowledged that Neal's actions were fraudulent and testified that, during the time their companies were working together, he was aware that Neal had come under "regulatory scrutiny," with which he was "not comfortable." Ennis also testified that he had been the subject of insurance regulators'

investigations based on his interaction with Neal.[6] Ennis testified that, because of this regulatory scrutiny, when he sent Fidelity's insurance documents to Neal, he attached a note advising Neal to "guard the complete set from our competitors and everyone except those in your inner circle" and to "reformat them to appear different from ours for the regulators."

This evidence suggests, for purposes of this special appearance, that Ennis took actions—such as entering contracts and engaging in frequent communications with Neal and his entities, and traveling to Texas to facilitate business with Neal—with knowledge that the arrangements between his and Neal's companies were part of a fraudulent insurance scheme. Ennis acquiesces to these facts, only challenging that they do not establish minimum contacts because he was acting on behalf of his corporations. Even if Ennis performed these actions in a corporate capacity, he can be held personally liable for fraudulent activity and, therefore, should have anticipated being haled into a Texas court to answer for these actions. Ennis's uncontroverted actions establish minimum contacts between him, as an individual, and the State of Texas.

### Specific Jurisdiction: Nexus and Due Process Considerations

Having established that Ennis purposefully directed minimum contacts toward Texas, thereby satisfying the first prong of Texas's three-part jurisdictional inquiry, the determination of whether it is appropriate to subject him to specific jurisdiction depends on (i) whether a nexus exists between those contacts, the forum, and the litigation and (ii) whether the exercise of jurisdiction would comport with due process considerations. *See BMC Software*, 83 S.W.3d at 795-96.

---

[6] The Florida Department of Insurance informed Ennis in 2001 that their investigation determined Fidelity had engaged in unauthorized insurance practices.

The insurance activities that occurred between Ennis's two companies and the Texas-based ABP, UEVEBA, and NAWA, are undisputably connected to the underlying litigation. Loiseau testified, and Ennis conceded, that of the 3,040 proofs of claims filed against Ennis, Fidelity, and NetPay, 409 of them were filed by Texas residents. Based on this, a nexus is present between Ennis's contacts, the forum, and the litigation.

Ennis does not assert that it would be burdensome for him to litigate in Texas. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985) (nonresident defendant has burden to present "compelling case" of why litigation in forum would be unduly burdensome to avoid jurisdiction). Even if his special appearance were granted, Ennis must be in Texas as a part of this litigation as the president of Fidelity, which did not challenge jurisdiction, and of NetPay, which filed a special appearance but did not challenge its denial. Because Ennis does not contest this issue, and because he does not assert that any greater burden results from appearing individually than already exists from appearing as a corporate representative, we determine that it does not violate the traditional notions of fair play and substantial justice to subject Ennis to personal jurisdiction in Texas.

It is, therefore, appropriate to exercise specific jurisdiction over Ennis, in his individual capacity, based on the evidence suggesting that he participated in a fraudulent scheme for which he may be personally liable. Because these actions established minimum contacts, which were substantially connected to Texas and the underlying litigation, and because it comports with due process considerations for Ennis to litigate in Texas, we affirm the trial court's order denying his special appearance. Ennis's first issue is overruled.

20

**Findings of Fact and Conclusions of Law**

In his fourth issue, Ennis contends that the trial court erred by not issuing findings of fact and conclusions of law upon his request. Ennis recognizes that Texas Rule of Appellate Procedure 28.1 gives the trial court discretion whether to issue these. *See* Tex. R. App. P. 28.1 ("The trial court *need not, but may*—within 30 days after the order is signed—file findings of fact and conclusions of law.") (emphasis added). Also, Ennis brings this claim only in the alternative, stating that "if this Court is able to determine the jurisdictional issues without the trial court's findings and conclusions," then "he does not want the expense of returning to the trial court" to obtain them. Because we are able to determine the jurisdictional issues on the record before us, we hold that the trial court did not abuse its discretion in deciding to not issue findings and conclusions. Ennis's fourth issue is overruled.

## CONCLUSION

Holding that the record contains sufficient evidence to subject Ennis individually to specific personal jurisdiction in Texas and that no reversible error occurred, we overrule Ennis's issues and affirm the trial court's order denying his special appearance.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed: May 5, 2005

21