ACCEPTED
01-14-00703-cv
FIRST COURT OF APPEALS
HOUSTON, TEXAS
7/14/2015 11:55:35 PM
CHRISTOPHER PRINE
CLERK

NO. 01-14-00703-CV

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
7/14/2015 11:55:35 PM
CHRISTOPHER A. PRINE
Clerk

IN THE COURT OF APPEALS FOR THE
FIRST DISTRICT OF TEXAS AT HOUSTON

**CHRISTOPH HENKEL**

*Appellant*

**v.**

**EMJO INVESTMENTS, LTD. and H.J. VON DER GOLTZ**

*Appellees*

On appeal from the 215th Judicial District Court, Harris County, Texas
The Honorable Elaine H. Palmer, presiding
Cause No. 2011-44058

**SUPPLEMENTAL BRIEF OF APPELLEES**

Kelley M. Keller
State Bar No. 11198240
Tracey N. Ellison
State Bar No. 15054720
5120 Woodway, Suite 6019
Houston, Texas 77056
Telephone: 713-266-8200
Facsimile: 713-266-8201
kkeller@ellison-keller.com

*Attorneys for Appellees*

July 14, 2015

# TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................................i

TABLE OF AUTHORITIES................................................................................ii

I.     *Moncrief* Supports the Exercise of Personal Jurisdiction Over Henkel ..........1

II.    Intervenors' Pleadings Support a Finding
in Favor of Personal Jurisdiction................................................................9

       A.    The Intervenors' Petition in Intervention and Briefing
           Establish the Relationship Between Henkel's Texas Contacts
           and the Pending Claims. ..............................................................4

       B.    Henkel Defines the Pending fraud Claims Too Narrowly ....................12

       C.    As an Alleged Co-Conspirator, Henkel is Potentially Liable
           for All Actions in Pursuit of the Conspiracy,
           Regardless of When They Occurred .......................................................14

III.   The Intervenors' Investments .......................................................................15

CONCLUSION ...............................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*AmQuip Corp. v. Cloud,*
 73 S.W.3d 380 (Tex. App.—Houston [1st Dist.] 2002, no pet.)...........................8

*Blubonnet Petroleum, Inc. v. Kolkhorst Petroleum Co., Inc.,*
 No. 14-07-00380-CV, 2008 Tex. App. LEXIS 7724
 (Tex. App.--Houston [14 th Dist.] Oct. 9, 2008, pet. denied) ...........................7, 8

*City of Keller v. Wilson,*
 168 S.W.3d 802 (Tex. 2005) ...................................................................9

*Ennis v. Loiseau,*
 164 S.W.3d 698 (Tex. App.—Austin 2005, no pet. .........................................9, 10

*Greenberg Traurig of N.Y., P.C. v. Moody,* 161 S.W.3d 56 (Tex. Civ. App.—
 Houston [14th Dist.] 2004, no pet.)...........................................................14

*Hale v. Richey,* No. 10-11-00187-CV,
 2012 Tex. App. LEXIS 261 (Tex. App.—Waco Jan. 11, 2012, no pet.) .............10

*Hancock v. Variyam,*
 400 S.W.3d 59 (Tex. 2013) .....................................................................9

*Moncrief Oil International, Inc. v. OAL Gazprom,*
 414 S.W.3d 142 (Tex. 2013) ...........................................................*passim*

*Michiana Easy Livin' Country, Inc. v. Holten,*
 168 S.W.3d 777 (Tex. 2005) .....................................................................2

*Pulmosan Safety Equip. Corp.,*
 273 S.W.3d 829 (Tex. App.—Houston [14th Dist.] 2008, pet. denied)...............17

*Retamco Operating, Inc. v. Repuglic Drilling Co.,*
 278 S.W.3d 333 (Tex. 2009) .....................................................................6

*Sacks v. Hall,*
 No. 01-13-00531-CV, Tex. App.--Houston [1st Dist.] Nov. 20, 2014, no pet.) ....9

*Service Corp. International v. Guerra,*
   348 S.W.3d 221 (Tex. 2010) ..................................................................................9

*Wikert v. Year One, Inc.*,
   320 S.W.3d 522 (Tex. App.—Dallas 2010, no pet.) ...............................................9

TO THE HONORABLE FIRST COURT OF APPEALS:

At the conclusion of oral argument, the panel requested that Appellant address *Moncrief Oil International, Inc. v. OAO Gazprom*, 414 S.W.3d 142 (Tex. 2013), in a supplemental submission to the Court and requested that Appellees identify for the Court the dates of the investments made the subject of this litigation. The panel further gave Appellees the opportunity to respond to Appellant's briefing on *Moncrief*. Appellees submit the following.

## I.      *Moncrief* Supports the Exercise of Personal Jurisdiction Over Henkel.

The Texas Supreme Court in *Moncrief*, made it clear that the inquiry on personal jurisdiction is concerned with matters of "*physical* fact" and not the thoughts, words, or intent of the parties attending those physical facts. 414 S.W.3d at 147. The key *physical* fact here is the undisputed presence of Henkel in Texas on at least two occasions for meetings with his co-conspirator allegedly in furtherance of the conspiracy to defraud investors of NC12,[1] a Texas-based company. What the parties said, thought, or intended in those meetings are questions for the trier of fact on the merits, not for the inquiry on personal jurisdiction.

---

[1]      The claims arise from the actions of the defendants in soliciting and retaining investors in TSI and its successor entity NC12. (*See* CR 36-69; CR Supp. 11-42). Accordingly, for simplicity purposes herein, references hereinafter to "NC12" or the "Company" refer to TSI and NC12.

1

The Supreme Court in *Moncrief* explained that:

> [T]he business contacts needed for specific personal jurisdiction over a nonresident defendant "are generally a matter of physical fact, while tort liability (especially misrepresentation cases) turns on what the parties thought, said, or intended. Far better that judges should limit their jurisdictional decisions to the former rather than involving themselves in trying the latter."

414 S.W.3d at 147 (quoting *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 791 (Tex. 2005)).

Accordingly, Henkel's complaint that there is no evidence of *what* the parties may have discussed during the meetings in Texas is without merit. Whether or not the meetings were in fact in furtherance of the alleged conspiracy is a question to be addressed at the merits stage. The physical facts were sufficiently established to support personal jurisdiction over Henkel on claims arising from Henkel's contacts with Sydow.

Intervenors submitted the affidavit of Austin Kimball ("Kimball") in support of their objection to Henkel's Special Appearance. (CR 305-06). Kimball worked as an administrative assistant for NC12 and Sydow's law firm from 2008 through 2010. Kimball's affidavit unequivocally establishes two meetings between Henkel and Sydow in Texas during Kimball's affiliation with NC12. (*Id.*). Any suggestion otherwise is disingenuous.[2]

---

[2]    Kimball stated that when he first picked up Henkel, he did so at Sydow's instruction for a meeting with Sydow. (CR 305). If Henkel did not meet with Sydow at the Houstonian on that first occasion, Henkel had sufficient opportunity to identify the party or parties that he did meet

2

Despite ample opportunity to rebut Kimball's affidavit testimony – either in reply to the Intervenors' response to his special appearance or in response to the Intervenors' Motion for New Trial – Henkel failed to submit *any* evidence to challenge Kimball's testimony placing Henkel in Texas for meetings with Sydow in furtherance of a conspiracy during the period that NC12 was soliciting lenders and investors and issuing NC12 shares.

Accordingly, the trial court was entitled to find that Henkel did meet with Sydow in Texas during the period of the alleged conspiracy.[3] Here, it is important to note that the only affidavit that Henkel executed and submitted in support of his special appearance contained the following factual statements that were proven to be false.

- *Henkel misrepresented his travel to Texas.* Henkel stated under oath that he had not visited or traveled to Texas in the past 30 years. (CR 33). Henkel did not even attempt to rebut the Kimball Affidavit.[4]

---

with at the Houstonian. He did not. Accordingly, the only inference that may be drawn from the evidence submitted is that the first meeting with Sydow occurred at the Houstonian hotel.

[3]     Henkel will have the opportunity at the merits stage to explain what the parties thought, said, or intended during those meetings with Sydow, or otherwise explain the "abundant legitimate reasons" Henkel suggests on appeal that the two men may have met.

[4]     Henkel's counsel stated at oral argument that it would not be surprising that a man as busy and as well-travelled as Henkel may not have remembered at the time he signed his affidavit in support of his Special Appearance that he had traveled to Texas. However, once his memory was jogged by the Kimball Affidavit, Henkel had the opportunity to submit evidence either (1) challenging the accuracy of Kimball's testimony regarding the visits to Texas and the meetings with Sydow, *e.g.* even a simple denial of same, and/or (2) establishing a different purpose for the visits, *e.g.* Sydow arranged for his rides as a friend, but the meetings were not with Sydow and were unrelated to NC12 matters. Henkel failed to challenge the Kimball testimony in any respect.

- *Henkel misrepresented his investments in Texas.* Henkel stated under oath that he did not have any investments in Texas. (CR 33). However, Henkel was a shareholder in Texas-based NC12 in his individual capacity, with 19,230 shares listed as held in his name. (CR 164).

- *Henkel misrepresented his participation in litigation in Texas.* Henkel stated under oath that, other than this lawsuit, he had never been a party to litigation in any state or federal court in Texas(CR 34). The evidence before the trial court proved this statement to be false. (*See* CR 128, 134-39). Henkel was a defendant in a prior lawsuit arising from his service as a board member for another company and had waived his special appearance in that matter to join a motion for entry of a proposed settlement. (*Id.*).

- *Henkel misrepresented his service as a director of NC12.* Henkel claimed that he joined the TSI board of directors in early 2008 and left the TSI board in May 2009. He denied ever having been a director of NC12. (CR 145, 147-48). That denial was false. (*See* CR 157-59, 193-94).

Given the falsehoods by Henkel disclosed through the Intervenors' briefing, the trial could have reasonably judged the credibility of the witnesses in favor of the Intervenors and that Henkel's meetings in Texas with Sydow were related to the claims for fraud and conspiracy to commit fraud.

Moreover, even had Henkel responded to the Kimball affidavit with his own evidence that the meetings with Sydow were not in furtherance of the alleged conspiracy, the effort would not have precluded a finding in favor of jurisdiction. The Court in *Moncrief* rejected a similar attempt by the defendant to focus on the merits of the claim, explaining that "what the parties thought, said, or intended is generally irrelevant to their jurisdictional contacts." *Moncrief,* 414 S.W.3d at 147. There, the nonresident defendants *allegedly* misappropriated purported trade

4

secrets received from a Texas company concerning a proposed Texas venture during two meetings in Texas. *Id.* at 148. The defendants, however, claimed that their intent in attending the meetings was to discuss an unrelated matter, that they advised the plaintiff accordingly, and that they advised the plaintiff that they would not keep the information confidential. *Id.* at 153-54 & n.10. The Court held that "[r]egardless of the defendants' subjective intent, their *Texas contacts* are sufficient to confer specific jurisdiction over the defendants as to the trade secrets claim." *Id.* at 147 (emphasis added).

Under *Moncrief*, the Intervenors' allegations combined with the evidence confirming Henkel's *physical* contact with Texas through meetings in the state with an alleged co-conspirator in a conspiracy to commit fraud are sufficient to confer personal jurisdiction. Accordingly, the trial court did not need to infer that Henkel and Sydow did in fact engage in conspiratorial acts during those two meetings in Texas – that question is left for the merits stage of the litigation.

Contrary to Henkel's suggestion, the Court's discussion in *Moncrief* of the non-residents' acceptance of alleged trade secrets while in Texas does require a factual finding here that Henkel's meetings in Texas were in furtherance of the alleged conspiracy before the court may exercise personal jurisdiction over Henkel. Instead, the court need only have found that the evidence reflected *purposeful* activity by Henkel that was *related to* the plaintiff's claims.

In its analysis of the *purposeful* nature of the non-residents' contacts the Court in *Moncrief* noted that the defendants' "contacts with Texas were neither unilateral . . . nor random and fortuitous." *Moncrief*, 414 S.W.3d at 153. "Unlike in *Michiana*, the Gazprom Defendants had a 'say in the matter.'" *Id.* The Court noted that Gazprom "*agreed to attend* Texas meetings" and "*accepted* Moncrief's alleged trade secrets at those meetings" and concluded that Gazprom was not "unilaterally haled into forming contacts with Texas." 414 S.W.3d at 153 (emphasis added).[5]

Here, similarly, Henkel's meetings *in Texas* with NC12 director and alleged co-conspirator Sydow were purposeful contacts with the state related to the Intervenors' claims for fraud and conspiracy to commit fraud. Just like the defendants in *Moncrief*, Henkel "had a 'say in the matter.'" He could have declined service on the NC12 board and/or could have declined to meet with Sydow in Texas. He was not brought into this state by the unilateral actions of the Plaintiffs or the Intervenors but by his own purposeful activity.

---

[5] Notably, the Court cited the discussion in *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009), regarding the *willing* nature of the defendant's contacts with Texas. *Id.* The Court explained that the defendants "*were not unilaterally haled* into forming contacts with Texas; *rather*, they *agreed to attend* Texas meetings. And the Gazprom Defendants *accepted* Moncrief's *alleged* trade secrets at those meetings." *Moncrief*, 414 S.W.3d at 153 (emphasis added). The use of the term "rather" confirms that the Court intended to contrast *unilateral* activity of the plaintiff with *purposeful* activity of the defendant by noting the allegations as to what the defendants allegedly *physically* did in Texas as opposed to creating a standard that would require evidence of the matters going to the merits of the claim. That the plaintiff supported the allegation regarding *what* happened during the meeting was relegated to a footnote.

Contrary to Henkel's assertion, the absence of evidence at to *what* Sydow and Henkel discussed during their meetings in Texas does not render the claims here like the tortious interference claims in *Moncrief*. The meetings identified in support of the tortious interference claim in *Moncrief* took place in California, not Texas. The Court noted that "the tortious interference claim [was] principally concerned with the California meeting and the competing Texas enterprise[6] – not the purported misappropriate of alleged trade secrets," that was alleged to have occurred in Texas. *Moncrief*, 414 S.W.3d at 157. The Court's decision on the tortious interference claim in *Moncrief* is entirely consistent with its focus on the *physical* facts – not the merits of the claims.

Accordingly, Henkel could potentially defeat personal jurisdiction only if the evidence supported a finding that Henkel *did not meet with* Sydow in Texas, not by challenging the purpose or substance of those meetings. The evidence did not support that finding.

Henkel's complaint that evidence that a communication took place is not evidence of the content of that communication is irrelevant in the context of the personal jurisdiction analysis, and the authority cited in support is inapplicable. The court in *Bluebonnet Petroleum, Inc. v. Kolkhorst Petroleum Co., Inc.*, 14-07-

[6] The Court noted that the court of appeals had rejected the alter ego theory advanced by Moncrief regarding the creation of the competing Texas entity as a basis of personal jurisdiction. *Moncrief*, 414 S.W.3d at 157.

7

00380-CV, 2008 Tex. App. LEXIS 7724 (Tex. App.—Houston [14th Dist.] Oct. 9, 2008, pet. denied) addressed a summary judgment on merits, not a decision on a special appearance. Although *AmQuip Corp. v. Cloud*, 73 S.W.3d 380 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (*abrogated on other grounds, PHC-Minden, L.P. v. Kimberly Clark Corp.*, 235 S.W.3d 163 (Tex. 2007)), did address personal jurisdiction, the inquiry was whether telephone records reflected phone calls or faxed advertisements, *i.e.* the *physical facts*, not the content of either.

Similarly, the trial court's decision did not require that the court use speculation to connect the alleged meetings to the Intervenors' claims. The connection was evident – a meeting between co-conspirators *in* Texas *during the relevant period*. Moreover, the fact that Henkel denied having been to Texas in 30 years is itself suggestive of the conspiracy. Certainly if the meetings in Texas were innocuous and not tied to the pending claims – either the meetings were not with Sydow or were related to non-NC12 matters – Henkel would have disclosed them and explained them in his initial affidavit in support of his special appearance. He did not.

Moreover, because the *physical* fact is the operative fact on personal jurisdiction, the trial court was not required to determine whether "Sydow and Henkel discussed a conspiracy to defraud, or [ ] ordinary business matters of TSI or NC12" as Henkel suggests.[7]

8

## II. Intervenors' Pleadings Support a Finding in Favor of Specific Jurisdiction.

### A. The Intervenors' Petition in Intervention and Briefing Establish the Relationship Between Henkel's Texas Contacts and the Pending Claims.

Henkel's complaint that the petition fails to allege that Henkel and Sydow discussed or furthered the alleged fraudulent conspiracy while meeting in Houston is misplaced. The inquiry is not confined to the petition. Instead, the trial court may consider all of the pleadings before the court – which would include the petition *and* the parties' briefing. *See* TEX. R. CIV. P. 120a ("The court shall determine the special appearance on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony."); *Wikert v. Year One, Inc.*, 320 S.W.3d 522, 524 (Tex. App.—Dallas 2010, no pet.); *Ennis v. Loiseau*, 164 S.W.3d 698, 705 (Tex. App.—Austin 2005, no pet.); *Hale v. Richey*, No. 10-

---

[7] Henkel cites *City of Keller v. Wilson*, 168 S.W.3d 802, 813 (Tex. 2005), *Service Corp. Int'l v. Guerra*, 348 S.W.3d 221 (Tex. 2010), *Sacks v. Hall*, No. 01-13-00531-CV (Tex. App.—Houston [1st Dist.] Nov. 20, 2014, no pet.), and *Hancock v. Variyam*, 400 S.W.3d 59, 70-71 (Tex. 2013), for the argument that the trial court violated the equal-inference rule. However, in each of those cases, the matters at issue were inferences related to ultimate findings by the trier of fact regarding the *merits* of the litigation. The trial court here did not need to infer that the meetings between Sydow and Henkel occurred in Texas – the finding is wholly supported by the Kimball Affidavit. Nor did the court need to infer *what* transpired during the meeting. The court needed only to find a connection between the meetings and the alleged fraudulent conspiracy. Intervenors specifically alleged the connection in their pleadings – the petition in intervention and briefing on the special appearance – by alleging that Sydow, Preston, and Henkel acted together to defraud investors and established the connection with evidence that at least two meetings between two of the alleged conspirators occurred in Texas.

9

11-00187-CV, 2012 Tex. App. LEXIS 261, *11 (Tex. App.—Waco Jan. 11, 2012, no pet.).

Appellees expressly alleged in their Motion for New Trial that the "two visits to Texas are significant as they reflect meetings *in Texas* between two NC12 directors in furtherance of the conspiracy alleged in Intervenors' Petition in Intervention." (CR 186). Further, the Intervenors' petition sufficiently outlines the alleged conspiracy to defraud the investors. For example, the Petition in Intervention expressly alleges the following:

- Preston failed to raise additional funds for Texas Syngas in 2009, and by mid-year Texas Syngas desperately needed funding. (CR 54).

- The Note Holder Intervenors, were issued convertible promissory notes, which provided for automatic conversion into common shares at a 20% discount of the new investor's valuation if Texas Syngas obtained qualified financing from a single investor of at least $5 million on or before September 30, 2010. (CR 54).

- If no qualified financing occurred, the notes would become due and payable within five days after a demand was made on or after the September 30, 2010, maturity date. (CR 54).

- Preston and Sydow represented to the Note Holder Intervenors that Texas Syngas was worth $300 million as of 2009, based on the value of the technology and certain alleged contracts held by the Company. (CR 55).

- Preston and Sydow failed to disclose that the contracts had been cancelled. (CR 55).

- In response to the discovery of financial mismanagement and misappropriation, H.J. von der Goltz ("von der Goltz") complained to Sydow in early August 2010 and demanded that Sydow provide

10

an accounting of Sydow's handling of the Company's funds. (CR 57-58).

- Sydow moved to obtain control of the Company, enlisting Preston and Henkel, who agreed to support the ouster of von der Goltz and Muderrisoglu as directors, and agreed individually to serve as replacement directors and to vote in favor of Sydow's takeover of the company, which resulted in the theft of its assets. (CR 59).

- Sydow, Preston, and Henkel, as the new board, revoked all access that von der Goltz had to the Company's bank accounts and records. (CR 59).

- Immediately after the board takeover, Sydow, Preston, and Henkel agreed to the deal with third parties that von der Goltz had opposed, except on terms much less favorable to NC12 than originally proposed. (CR 61).

- Sometime prior to the board takeover, Sydow, Preston, Henkel, created Meliora Energy Technologies, S.à.r.l (MET), a corporation owned by C Change, Chalsys, and Henkel. (CR 61).

- The new NC12 board, Sydow, Preston, and Henkel, represented to the NC12 shareholders that MET had provided NC12 with a $1.15 million bridge loan and a commitment for an additional investment of $5 million in equity. (CR 61).

- The supposed MET financing for $5 million resulted in the automatic conversion of the promissory notes into common shares. The NC12 board of directors, consisting of Preston, Henkel, and Sydow, informed the Note Holder Intervenors on September 28, 2010, that they were now common shareholders with 39.4% ownership, while MET owned 30.3% for its $5 million investment, and the "old" shareholder group would be diluted to 30.3%—down from 100%. (CR 62).

## B.    Henkel Defines the Pending Fraud Claims Too Narrowly.

Appellant defines the Intervenors' claims too narrowly. The bankruptcy court did dismiss the claim for breach of fiduciary duty and conspiracy to breach

11

fiduciary duties, but left to the Intervenors their claims for fraud – both statutory and common law – and conspiracy to commit fraud. (CR Supp. 40). In fact, the NC12 Trustee conceded that the securities fraud claims, as plead, were direct claims owned by the Intervenors, and the bankruptcy court agreed. (CR Supp. 32-33).

In its order remanding the fraud claims to the district court, Bankruptcy Judge Marvin Isgur distinguished the fraud claims from those that belonged to the NC12 estate on the basis of the nature of the damages suffered, confirming that "the Intervenors' claims for harm due to fraudulently induced investments are independent of any harm directly to NC12; indeed, NC12 benefited from the Intervenors' investments by having their cash." (CR Supp. 33). However, Judge Isgur did not dismiss "any claim regarding 'alleged post-purchase misconduct in the operation of the corporation'" as Henkel contends. (*See* Henkel Supp. Br. at pp. 6-7). Instead, the quote from Judge Isgur's order related to the measure of damages for the Intervenors' individual claims.[8] It would not preclude claims based on post-purchase conduct if that conduct relates to the alleged fraud.

---

[8]    Judge Isgur states in his order that "[b]ecause the Intervenors are shareholders, their fraud claim is based on the alleged difference between the price they paid in reliance on the alleged misrepresentations and the actual value of NC12's shares at the time of their investment." (CR 33). As a technical matter, the noteholder Intervenors did not become shareholders, if at all, until September 28, 2010, after Henkel had rejoined the NC12 board.

Here, the Intervenors have alleged an on-going fraud by the defendants – both by material misrepresentations *and omissions* – that resulted in continuing investments from December 2007 through August 2010, and the purported conversion of the promissory notes into shares in September 2010. (*See* CR 54-55, 62).

For example, the alleged wrongful takeover of the board by Sydow, Preston, and Henkel in August 2010 allowed the conspirators to hide the true financial condition of the Company from the noteholder Intervenors so that they would not demand payment on the matured notes. The Defendants then purported to convert the notes to shares in September 2010. (*See* CR 54-55, 62). The notes would have become due and payable within five days after their September 30, 2010 maturity dates if a "qualified financing" *had not* occurred. (CR 54). As reflected above, the Intervenors allege that the Defendants engaged in a conspiracy to commit fraud on the noteholder Intervenors by misrepresentations regarding the financial condition of the Company and the existence of an alleged qualified financing that permitted the conversion of the notes to shares before the notes matured. (CR 62). Significantly, the Defendants' actions purportedly transformed the notes from assets that the noteholders as lenders could have called due and sought to collect against into shares in a non-public company whose value was entirely dependent on the financial health of the Company. Accordingly, the Defendants' conduct

13

after the initial investment and loan dates, including the alleged wrongful takeover of the NC12 board, is relevant to the fraud claims before the trial court.

**C.** **As An Alleged Co-Conspirator, Henkel is Potentially Liable for All Actions in Pursuit of the Conspiracy, Regardless of When They Occurred.**

As a conspirator, Henkel would be jointly and severally liable for all actions in furtherance of the conspiracy, including those before and after his joining of the conspiracy. *See Greenberg Traurig of N.Y., P.C. v. Moody*, 161 S.W.3d 56, 101 (Tex. Civ. App.—Houston [14th Dist.] 2004, no pet.) ("It is well-settled law that upon joining a conspiracy, a defendant becomes a party to every act previously or subsequently committed by any of the other conspirators in pursuit of the conspiracy."). Accordingly, the specific timing of the meetings is irrelevant to the conspiracy claims as they necessarily occurred at some point during the alleged conspiracy given the dates set in the Kimball Affidavit.

## III.  Intervenors' Investments.

The Intervenors comprise two groups of investors, the "Shareholder Intervenors" and the "Noteholder Intervenors." The "Shareholder Intervenors" invested a total of $5,250,000 in cash in NC12 from late 2007 until early 2008. The "Note Holder Intervenors" invested $6,104,000 million from late 2009 until mid-2010. These Intervenors were issued promissory notes that were automatically convertible into common shares if at least a $5 million additional investment was obtained from an investor by September 30, 2010. On September 28, 2010, the Note Holder Intervenors were informed that their promissory notes had converted into common shares. (CR 38-39).

The investment dates are outlined in Schedule 1 attached hereto and are derived from the Petition in Intervention. (*See* CR 39-42).

## CONCLUSION

Appellees respectfully request that this Court affirm the order of the District Court.

Respectfully Submitted,

  /s/   Kelley M. Keller

Kelley M. Keller
State Bar No. 11198240
Tracey N. Ellison
State Bar No. 15054720
ELLISON & KELLER, P.C.
5120 Woodway Drive, Suite 6019
Houston, Texas  77056
713-266-8200 (Telephone)
713-266-8201 (Facsimile)
kkeller@ellison-keller.com

*Attorneys for Appellees*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing instrument was forwarded via electronic mail and/or eservice, to the following attorneys of record on July 14, 2015.

Jane Langdell Robinson
Jamie Aycock
AHMAD, ZAVITSANOS, ANAIPAKOS,
  ALAVI & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, Texas 77010
713-655-0062 (Facsimile)
*Attorneys for Appellant*

  /s/   Kelley M. Keller
Kelley M. Keller

16

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typefact and word-count requirements set forth in the Texas Rules of Appellate Procedure. This brief has been prepared, using Microsoft Word, in 14-point Times New Roman for the body and 12-point Times New Roman for footnotes. This brief contains 4,040 words, as determined by the word count feature of Microsoft Word, excluding those portions exempted by TEX. R. APP. P. 9.4(i)(1).

/s/   Kelley M. Keller
Kelley M. Keller