# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00489-CV

**MedCost, L.L.C., Appellant**

**v.**

**Robert Loiseau, Special Deputy Receiver of American Benefit Plans, et. al., Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT NO. GN304388, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING

## D I S S E N T I N G  O P I N I O N

Because MedCost purposefully established ongoing relationships with fraudulent Texas insurance entities and directed actions toward Texas that were foreseeably harmful to Texas consumers, I would hold that the evidence in the record is legally and factually sufficient to support the trial court's denial of MedCost's special appearance and would, therefore, affirm the order.

## BACKGROUND

In 2002, the insurance commissioners of several states determined that Texas should be designated with the primary responsibility of litigating the claims against a multistate insurance scheme; Texas was considered the most appropriate forum because the primary actors in the scheme—Robert David Neal, American Benefit Plans (ABP), National Association of Working

Americans (NAWA), and United Employers Voluntary Employees Beneficiary Association (UEVEBA)—were all based in the Fort Worth area. Robert Loiseau was appointed as the special deputy receiver for several of the companies accused of insurance fraud. After the trial court entered a final judgment and permanent injunction against the receivership entities, finding that they had engaged in the unauthorized business of insurance and enjoining them from any further unauthorized practices, Loiseau brought suit against several insurance companies accused of facilitating the scheme and profiting from their involvement with the receivership entities. Pursuant to article 21.28 of the Texas Insurance Code, Loiseau's duties were to "take possession of the assets," liquidate, and distribute them among the claimants. *See* Tex. Ins. Code Ann. art. 21.28, §§ 2 ("General Procedures"), 8 ("Distribution of Assets") (West 1981 & Supp. 2004-05).

As support for exercising personal jurisdiction over the named defendants, including MedCost, Loiseau relied upon section 101.001 of the Texas Insurance Code, setting forth the state's policy and statute's purpose:

(a) It is a state concern that many residents of this state hold insurance policies issued by persons or insurers who are not authorized to do insurance business in this state and who are not qualified as eligible surplus lines insurers under Article 1.14-2. These residents face often insurmountable obstacles in asserting legal rights under the policies in foreign forums under unfamiliar laws and rules of practice.

(b) It is the policy of this state to protect residents against acts by a person or insurer who is not authorized to do insurance business in this state by: (1) maintaining fair and honest insurance markets; (2) protecting the premium tax revenues of this state; (3) protecting authorized persons and insurers, who are subject to strict regulation, from unfair competition by unauthorized persons and insurers; and (4) protecting against evasion of the insurance regulatory laws of this state.

2

(c)  The purpose of this chapter is to subject certain insurers and persons to the jurisdiction of: (1) the commissioner and proceedings before the commissioner; and (2) the courts of this state in suits by or on behalf of the state or an insured or beneficiary under an insurance contract.

(d)  It is also a concern that this state not become a safe harbor for persons or insurers engaged in the unauthorized business of insurance in this state, regardless of whether the insureds or other persons affected by the unauthorized business of insurance are residents of this state.

*Id*. § 101.001 (West Supp. 2004-05).

Loiseau further alleged that the defendants "committed torts in the State of Texas and entered into contracts with one or more of the Receivership Defendants in the State of Texas." Loiseau alleged that the defendants profited from their involvement with ABP in the insurance scheme to the detriment of Texas and its residents because the receivership entities collected money (as premiums) from Texas residents and then passed those dollars along to the defendants, including MedCost.  Based on this, Loiseau claimed the defendants were liable for negligence, gross negligence, breach of fiduciary duty, violation of Texas Insurance Code section 101.201, conspiracy, and negligent misrepresentation.  Specifically against the Network Leasor Defendants, which included MedCost,[1] Loiseau alleged liability based on an agreement to "market, sell, manage and administer the unlicensed and unauthorized health insurance programs," and the negligent failure to use due diligence in determining whether ABP and NAWA were properly licensed and financially sound and in discovering that Neal was the subject of several insurance complaints and indicted for federal tax fraud.

---

[1]  The defendants were categorized into five classes, depending on their alleged role in the scheme, as follows: (1) Neal Defendants, (2) Third Party Administrators and PEOs, (3) Network Leasors, (4) Tim Tierney, and (5) General Agents and Managing General Agents.

At the special appearance hearing, Loiseau testified and MedCost presented deposition testimony from its Vice President of Administration, Joel Groce, concerning this complex series of insurance relationships, transactions, and practices. Groce described MedCost as a preferred provider organization that contracts with a network of doctors and healthcare facilities in North and South Carolina to provide services at discounted rates to persons who present identification cards showing that they are entitled to the benefits of MedCost's network. He testified that MedCost leases this network to various insurance carriers—several of which are located in Texas—and, pursuant to that arrangement, the carriers provide their insureds with the necessary identification cards. In relation to each carrier, MedCost is responsible for approving the card's language before the cards can be distributed to the insureds. In determining whether to approve each card, as part of its due diligence MedCost considers an enumerated list of items: the checklist includes such concerns as making sure the payor (insurance carrier) is on MedCost's system and checking for any "red flags" regarding the payor.

Groce further testified that these insurance carriers become payors, or clients, of MedCost through a contract that MedCost has with American Healthcare Alliance (AHA), a Missouri company. The carriers pay a fee to AHA, and AHA pays a percentage of that fee to MedCost, on behalf of the carriers. After AHA brings the carriers to MedCost, MedCost leases its network to the carriers, and the carriers provide their insureds with cards allowing them to receive healthcare services at discounted rates from the providers in MedCost's network. Thus, MedCost acts as a "gatekeeper," determining which carriers it will form "strategic alliances" with by allowing them to take advantage of MedCost's network in exchange for a profit. Groce acknowledged that,

4

when AHA brings a new carrier to MedCost, MedCost does not make further inquiry into that carrier's background before opening the gate, but instead takes as true AHA's representation that the carrier satisfies its requirements.

The majority accepts MedCost's contention that the only relationship we should consider in determining whether personal jurisdiction is proper is MedCost's contract with AHA. Loiseau argued, however—and the trial court concluded—that the profit-based relationships MedCost established with fraudulent Texas insurers through the AHA leasing arrangement should also be considered in the jurisdictional inquiry.

Groce testified that one carrier MedCost leased its network to, via the AHA contract, was UltraMed Choice Health Plan a/k/a National Benefits Alliance, an Oklahoma company. UltraMed in turn contracted with Texas-based ABP and its principal, Robert Neal, to handle paying the various networks it leased, including MedCost. As with all carriers with which MedCost had a payor arrangement, MedCost used its enumerated checklist to approve the identification card that UltraMed issued to its insureds. An exhibit showed that all of the boxes were checked on UltraMed's form, demonstrating that MedCost had conducted a due-diligence review and determined there were no "red flags" concerning UltraMed. MedCost then approved UltraMed's card with MedCost's logo on it, "MedCost Preferred" printed at the bottom, and "UltraMed Choice Health Plan, Sponsored by the National Association of Working Americans [NAWA]" printed at the top. Groce claimed that MedCost had "no knowledge" of who NAWA was, but he admitted that MedCost determined "everything checked out" and approved the card for use.

5

After activating UltraMed as a payor in September 2001 and approving the UltraMed/NAWA card in October 2001, MedCost terminated UltraMed's access to its network in December 2002 because UltraMed had not paid its monthly leasing fees from September through December. UltraMed then paid its balance, and MedCost reactivated UltraMed in January 2002, using the same UltraMed/NAWA card as previously approved. UltraMed again failed to pay its fees for January through March, and on March 15, 2002, MedCost sent an e-mail to AHA stating that it was terminating its relations with UltraMed. The e-mail discussed UltraMed's connection with ABP and Neal, stating that Neal had been "indicted by the state of TX for selling insurance without a license and some other offenses," and that UltraMed is "a coalition of employers and that should have been our first red flag!" Groce testified that "a coalition of employers are very suspect. They're legal in some states and not legal in others. . . . [T]his is a danger zone and this one went bad."

Groce also affirmed that MedCost's relationships in the insurance industry are not confined to North and South Carolina. According to Groce, there are "multiple groups that use our network across the United States." MedCost has payor agreements with several Texas carriers, so that those carriers can benefit from MedCost's network for a monthly lease fee. This allows the insureds of the Texas carriers to receive services from MedCost's network of providers in the Carolinas.

At the hearing, Loiseau contended that MedCost's relations with the fraudulent insurance network established minimum contacts with Texas. The majority mischaracterizes Loiseau's position by claiming that Loiseau based his jurisdictional argument on the fact that

6

MedCost allowed Texas entities to harm Carolina residents. While MedCost may have done so, these are not the actions that Loiseau focused on as a basis for bringing MedCost into a Texas court.

Instead, Loiseau emphasized MedCost's connection with the Texas-based NAWA, Neal, and ABP—via the UltraMed account—as support for the exercise of personal jurisdiction over MedCost. Loiseau explained that the Texas-based NAWA used PPOs, including MedCost, "as a marketing device" to offer discounted rates, "entic[ing] people to buy this . . . relatively cheap insurance. That's how they got the working people, who bear the brunt of the fraud perpetrated by the participants in this program." In turn, MedCost profited from its dealings with NAWA, and MedCost was "paid ultimately from commingled funds, some of which came out of Texas." Loiseau testified that MedCost's approval of UltraMed's identification card, which contained MedCost's name and logo along with NAWA's, evidences a relationship between MedCost and NAWA: pursuant to this arrangement, NAWA collected money from Texas residents and passed it along to MedCost through the UltraMed account. Hence, MedCost "either knew they were doing business with NAWA, which was a Texas-based company, or they deliberately closed their eyes to it." Loiseau offered proof that MedCost knew it was dealing with a Texas company based on the facts that (1) at the time MedCost approved the UltraMed/NAWA card, NAWA was a Texas company, NAWA was operating without a license, and Neal had been indicted for tax and insurance fraud, all of which were documented in public records, and (2) MedCost terminated its relationship with UltraMed and NAWA when the State of Texas took action to shut down the scheme.

Loiseau also testified that MedCost had connections with UEVEBA, another Texas-based receivership entity. As support, he entered into evidence a contract displaying UEVEBA's

name at the top and showing that MedCost leased its network of providers to an employer in UEVEBA's group, Ideal Solutions, Inc.

Ultimately, Loiseau argued, MedCost's participation in this scheme allowed Neal, NAWA, ABP, and UEVEBA to perpetrate fraud on Texas consumers because it was "a significant selling point" for these Texas entities to be able to market themselves as having "nationwide" PPO coverage. Thus—contrary to the majority's assertion that Loiseau's argument was simply "because MedCost's contracts facilitated the Texas-based entities' providing illegal health insurance to users of MedCost's network in the Carolinas"—Loiseau demonstrated that MedCost purposefully established ongoing relations with Texas entities and that MedCost knew or should have known that the activities it engaged in with those entities were fraudulent. Based on this, the trial court denied MedCost's special appearance.

**ANALYSIS**

By determining that jurisdiction does not exist over MedCost because its approval of the UltraMed card was not "an act taken in Texas," the majority overlooks the well-established principle that personal jurisdiction exists when a nonresident defendant's activities are "purposefully directed at" the forum, regardless of where they physically occurred. *See*, *e.g.*, *Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 112 (connection between defendant and forum "must come about by an action of the defendant purposefully directed toward the forum State") (emphasis omitted); *Zac Smith & Co. v. Otis Elevator Co.*, 734 S.W.2d 662, 665-66 (Tex. 1987) (although defendant had "no physical ties to Texas," and contract was executed in Florida and Louisiana, specific jurisdiction existed over defendant because he purposefully directed actions at Texas by

8

entering contract that contemplated profits from Texas). The Supreme Court has expressly rejected the notion that a defendant is required to have some physical presence in the forum state to establish minimum contacts, especially given that "it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985).

Rather, the inquiry turns on whether the nonresident defendant purposefully availed itself of the privileges and benefits of conducting business in this state, such that the defendant could reasonably foresee being called into a Texas court to litigate. *Id.* at 474. This requirement is satisfied if the contacts are not random or fortuitous but the defendant "has created 'continuing obligations' between [it]self and residents of the forum." *Id.* at 475-76.

MedCost purposefully availed itself of the benefits and privileges of conducting business in Texas by establishing "continuing obligations" between itself and the Texas entities that played primary roles in the insurance scheme, such as NAWA, ABP, Neal, and UEVEBA. *See id.* at 474, 476 (jurisdiction appropriate when nonresident defendant creates continuing obligations with forum residents and "purposefully derive[s] benefit" from its interstate activities). MedCost acted as a gatekeeper by making the affirmative decision to permit these Texas entities—which MedCost knew or should have known[2] were selling fraudulent insurance policies to Texas consumers—to

---

[2] Having weighed the credibility of both parties, the trial court found that MedCost failed to act with due diligence concerning the legitimacy of the Texas entities, including ABP and NAWA. This finding should not be disturbed because it is supported by sufficient evidence, including Groce's testimony that MedCost relied solely on AHA's representations and the public records demonstrating that Neal had been investigated and indicted for insurance fraud. MedCost either had affirmative knowledge of the fraud involved, or turned a blind eye to it by failing to act with due diligence.

access its provider network. This network leasing arrangement benefited the Texas entities by enhancing their marketability and, in turn, benefited MedCost by participating in the network and allowing it to collect monthly fees from every entity that leased its network. MedCost's affirmative, checklist-based approval of the UltraMed identification card, which displayed MedCost's logo and stated that the plan was sponsored by NAWA, further demonstrates that MedCost's contacts were not random or fortuitous, but were instead purposefully directed toward Texas. Additionally, MedCost's actions satisfy the "purposeful" requirement because it was foreseeable that MedCost's ongoing involvement with these Texas entities would cause harm in Texas.[3]

Even if the nonresident defendant had no physical presence in Texas, it is generally appropriate to exercise specific jurisdiction over a nonresident who directs foreseeably harmful actions at the forum state—such as participating in a fraudulent scheme detrimental to Texas consumers—because the defendant has purposefully availed itself and, therefore, should anticipate being called to Texas to answer for those actions. *See, e.g.*, *Calder v. Jones*, 465 U.S.783, 789 (1984) (tort committed in Florida that caused harm in California supported California's jurisdiction over Florida defendant); *Siskind v. Villa Found. for Educ., Inc.,* 642 S.W.2d 434, 437 (Tex. 1982)

---

[3] A reviewing court should be mindful that a special appearance is not the appropriate stage to make a determination on liability; issues of ultimate liability are separate inquiries and are properly reserved for trial on the merits. *Walker Ins. Servs. v. Bottle Rock Power Corp*., 108 S.W.3d 538, 549 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *French v. Glorioso,* 94 S.W.3d 739, 746 (Tex. App.—San Antonio 2002, no pet.); *Ross F. Meriwether & Assoc., Inc. v. Aulbach*, 686 S.W.2d 730, 732 (Tex. App.—San Antonio 1985, no writ). Facts suggesting the nonresident defendant engaged in tortious activity that foreseeably caused harm in Texas must be considered, however, in order to determine whether the defendant should have anticipated being haled into a Texas court. *See Siskind v. Villa Found. for Educ., Inc.,* 642 S.W.2d 434, 437 (Tex. 1982) (facts supporting allegations of defendant's deceptive trade practices were relevant to jurisdictional inquiry); *French,* 94 S.W.3d at 743-44 (jurisdictional determination only requires sufficient evidence to support implied findings that suggest, but do not ultimately prove, liability).

(Arizona defendant's misrepresentations and deceptive trade practices that harmed Texas residents supported specific jurisdiction in Texas); *Ennis v. Loiseau,* No. 03-04-00748-CV, 2005 Tex. App. LEXIS 3412, at *30 (Tex. App.—Austin May 5, 2005, no pet. h.) (nonresident's participation in fraudulent insurance scheme that harmed Texas consumers supported specific jurisdiction); *LeBlanc v. Kyle*, 28 S.W.3d 99, 104 (Tex. App.—Texarkana 2000, pet. denied) (specific jurisdiction in Texas appropriate over French manufacturer based on contract with Vermont company to distribute faulty water heaters to "the fifty states," which included Texas); *Memorial Hosp. Sys. v. Fisher Ins. Agency, Inc*., 835 S.W.2d 645, 650 (Tex. App.—Houston [14th Dist.] 1992, no writ) (nonresident defendant's single misrepresentation, made to Texas entity over telephone from out-of-state, supported specific jurisdiction in Texas); *General Elec. v. Brown & Ross Int'l*, 804 S.W.2d 527, 532-33 (Tex. App.—Houston [1st Dist.] 1990, writ denied) (New York defendant's participation in conspiracy that would foreseeably defraud Texas consumers supported Texas's specific jurisdiction, even though defendant had never been present in Texas).

Although the majority notes that foreseeability is an important component of the jurisdictional inquiry, it overlooks the fact that MedCost's actions were foreseeably harmful to Texas residents, asserting instead that MedCost's actions "jeopardized only residents and consumers of the Carolinas." To reach this conclusion, the majority views MedCost's involvement with the Texas-based entities as a one-way street. But MedCost operated as the gatekeeper. Not only did MedCost open the gate and allow the fraudulent Texas insurers into its network, MedCost in turn profited from this arrangement. Moreover, this arrangement was detrimental to Texas consumers; by advertising themselves as "nationwide," the fraudulent Texas insurers were able to defraud many

11

Texas consumers into purchasing the "bogus" insurance products, and the money collected from these Texas victims was used to pay MedCost. Because MedCost's actions facilitated the fraud perpetrated on Texas residents, and MedCost profited from that fraud, MedCost is subject to the jurisdiction of Texas courts. MedCost should have anticipated this when it approved the identification card, which was a specific, purposeful action taken by MedCost with knowledge that it was establishing an ongoing relationship with a fraudulent Texas insurer (NAWA).

The Texas Legislature has articulated a state policy to protect its residents from the harm caused by unauthorized insurance practices and to prevent Texas from becoming a "safe harbor for persons or insurers engaged in the unauthorized business of insurance in this state, regardless of whether the insureds or other persons affected by the unauthorized business of insurance are residents of this state." Tex. Ins. Code Ann. § 101.001. This state policy, along with the well-established jurisprudence that a nonresident defendant should anticipate being haled into Texas when it participates in activities that are foreseeably harmful to Texas residents, supports the exercise of specific jurisdiction over MedCost. MedCost could reasonably foresee that it would have to defend its actions in Texas based on section 101.201 of the insurance code, which states that a "person who in any manner assisted directly or indirectly in the procurement of [an unauthorized insurance] contract is liable to the insured for the full amount of a claim or loss under the terms of the contract if the unauthorized insurer fails to pay the claim or loss." *Id.* § 101.201(a) (West Supp. 2004-05).

MedCost's actions were not confined to the Carolinas. Rather, MedCost established, through its many network leases, ongoing relationships with a web of entities involved in a multistate insurance scheme. The majority notes that no finding of fact stated that MedCost had a

direct contract with any Texas entity. In findings of fact 10, 14-15, and 26, the trial judge found that, pursuant to its contract with AHA, MedCost was "involved in the ABP scheme" and sold the UltraMed plan, which was an ABP product, and that MedCost profited from this plan, which was administered by PAR and sponsored by NAWA. MedCost had purposeful, ongoing relationships with the fraudulent Texas insurers, and it should not be permitted to benefit from clever structuring, given its participation in and knowledge of the network that operated to the detriment of Texas consumers. That MedCost's relationships with the Texas entities were established through third-party entities does not provide it immunity from suit in Texas, where hundreds of thousands of dollars have been lost. "[A] truly interstate business may not shield itself from suit by a careful, but formalistic structuring of its business dealings." *Siskind*, 642 S.W.2d at 437. MedCost's participation in the insurance scheme, therefore, amounts to "minimum contacts" purposefully directed at Texas.

If a nonresident defendant has purposely established minimum contacts with the forum state, then the second prong of the specific jurisdiction inquiry asks whether those specific contacts gave rise to, or are connected with, the underlying claims. *Schlobohm v. Schapiro*, 784 S.W.2d 355, 358 (Tex. 1990). Here, the claims that were assigned to the receiver in the underlying suit are substantially connected to the purposeful contacts MedCost established with Texas through its relationships with NAWA, ABP, Neal, and UEVEBA, thereby satisfying the second prong of the specific jurisdiction inquiry.

*Botter v. American Dental Association*, the case primarily relied on by MedCost, is distinguishable. *See* 124 S.W.3d 856 (Tex. App.—Austin 2003, no pet.). Contrary to the facts of

13

*Botter*, here there was a substantial connection between MedCost's actions, the State of Texas, and the claims at issue in the underlying suit, based on MedCost's continuing obligations to and its participation with the regulated Texas entities in the networked scheme that facilitated the perpetration of fraud on Texas consumers, from which MedCost profited. *Botter*, therefore, does not support MedCost's claim that Texas lacks specific jurisdiction over it.

"Once it has been decided that a defendant purposefully established minimum contacts within the forum state, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King Corp.*, 471 U.S. at 476. These factors include: (1) the burden on the defendant, (2) the interests of the forum state in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 228 (Tex. 1991) (citations omitted); *see also Asahi Metal Indus.*, 480 U.S. at 113 (discussing factors to consider).

A nonresident defendant who has established minimum contacts with the forum, yet seeks to avoid jurisdiction based on these factors, must present a "compelling case" that the traditional notions of fair play and substantial justice would be violated by subjecting him to litigation in the forum; "the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed." *Burger King Corp.*, 471 U.S. at 474, 477. Moreover, "[b]ecause the minimum contacts analysis now encompasses so many

14

considerations of fairness, it has become less likely that the exercise of jurisdiction will fail a fair play analysis." *Schlobohm*, 784 S.W.2d at 357-58.

MedCost claims that, even if minimum contacts are established, it should not be subjected to jurisdiction because it and the witnesses with relevant knowledge are located in North and South Carolina, the claims against MedCost originally belonged to citizens of the Carolinas, and Texas has no greater interest in litigating these claims than do North and South Carolina. MedCost does not present any evidence beyond the conclusory statement in Groce's affidavit that litigating in Texas would be an "extreme burden." This is not a "compelling case" against the reasonableness of exercising personal jurisdiction over MedCost.

Travel required by a corporate defendant and its employee witnesses to the forum does not constitute a substantial burden or undue hardship as to violate the Due Process Clause if the defendant has purposefully availed itself of that forum. Distance alone is not sufficient to defeat jurisdiction, given that "modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity." *Burger King Corp*., 471 U.S. at 474; *see also Guardian Royal*, 815 S.W.2d at 231. In a receivership action involving multistate transactions and relationships such as this, where parties and witnesses from across the country are involved in the same suit, it is unavoidable that some will have to travel. MedCost, therefore, has not satisfied its threshold burden of showing that it would be unfairly burdensome to require it to litigate in Texas.

While it is true that the specific claims against MedCost belonged to residents of North and South Carolina before they were assigned to the Special Receiver, this does not support

MedCost's argument. First, it is significant that many Texas consumers were harmed by the fraud that MedCost knowingly facilitated through its involvement with the Texas-based entities. Although these Texas consumers did not name MedCost in their underlying claims, MedCost played a role in the fraud perpetrated by the defendants that were named by the Texas victims; MedCost must answer for the harm it caused in this state.

Moreover, all of the underlying claims—including those brought by Carolina residents against MedCost—have been assigned to Loiseau and are being litigated in Texas. A factor to be considered in the due process analysis is the plaintiffs' interest in obtaining effective relief. Here, the victims determined that their most effective method of obtaining relief was to assign their claims to the receiver in Texas, rather than to bring individual suits against MedCost elsewhere. It would not be practical or efficient—from an individual or a judicial perspective—for the hundreds of plaintiffs to litigate these claims separately across the country. Loiseau testified at the special appearance hearing that it was not economically feasible for the receiver to sue each of the defendants in their respective home states. Hence, the plaintiffs' interests are served by maintaining this suit in Texas.

Further, the nature of the underlying litigation supports jurisdiction in Texas because it involves insurance, a highly regulated industry. *See Burstein v. State Bar of Cal.*, 693 F.2d 511, 522 (5th Cir. 1982 ) (fact that insurance is highly regulated industry was factor to consider in denying special appearance); *Guardian Royal*, 815 S.W.2d at 229 & n.8 ("[A] state's regulatory interest in a certain area or activity such as insurance is an important consideration in deciding whether the exercise of jurisdiction is reasonable and [] a state's regulatory interest may establish the

reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required."). Insurance fraud is a nationwide problem that all states have a shared interest in efficiently resolving, which is why the multistate group of commissioners took collective action in this case. These considerations distinguish the instant case from the majority of special appearance cases, which typically concern the private business dealings or sales transactions between individual companies and, unlike the insurance industry, do not impact the general public. It therefore serves the interest of the interstate judicial system in protecting the state's citizens, as well as the shared interest of the several states, to bring the claims against MedCost in Texas.

Finally, Texas's interest in litigating here is substantial. Several of the primary actors in this insurance scheme were based in Texas, including NAWA, ABP, Neal, and UEVEBA. MedCost established connections with these entities and facilitated their ability to defraud Texas consumers. As MedCost's vice president testified, MedCost formed "strategic alliances" with insurance carriers in many states, including several Texas companies. Texas has statutorily recognized that, when the unauthorized practice of insurance has occurred, its "residents face often insurmountable obstacles in asserting legal rights under the policies in foreign forums under unfamiliar laws and rules of practice." Tex. Ins. Code Ann. § 101.001(a). Based on MedCost's acknowledged connections with the insurance industry in Texas, no due process violation results from recognizing Texas's interest in subjecting MedCost to jurisdiction in this state.

Because it is not unduly burdensome to subject MedCost to the jurisdiction of a Texas court, and because the interests of Texas, the plaintiffs, and the several states are all served by doing

17

so, the exercise of personal jurisdiction over MedCost comports with the traditional notions of fair play and substantial justice.

Because the evidence supports the exercise of specific jurisdiction over MedCost, I would affirm the trial court's order.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Filed:   May 26, 2005

18