**AFFIRMED; Opinion Filed February 17, 2017.**



**In The**

**Court of Appeals**

**Fifth District of Texas at Dallas**

**No. 05-16-00694-CV**

**NEVADA NATIONAL ADVERTISING, INC., AND ROBERT SUSSMAN, Appellants**

**V.**

**SILVERLEAF RESORTS, INC., Appellee**

**On Appeal from the 298th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-14-13688**

# MEMORANDUM OPINION

Before Justices Francis, Fillmore, and Myers
Opinion by Justice Myers

Appellants Nevada National Advertising, Inc. (NNA) and Robert Sussman appeal the trial court's order denying their special appearance. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(7) (West Supp. 2016). They raise two issues, arguing the trial court erred by denying their special appearance because neither has sufficient minimum contacts with Texas and haling them into court here would offend traditional notions of fair play and substantial justice. We affirm.

### INTRODUCTION AND PROCEDURAL HISTORY

Appellant NNA is a Nevada corporation[1] that purports to represent timeshare owners to obtain their release from timeshare obligations that they can no longer afford, have not paid for,

---

[1] NNA's website is hosted by Lunar Pages which has its place of business in Anaheim, California.

or are too elderly to use. Appellant Sussman is NNA's sole officer and owner.[2] Appellee Silverleaf Resorts, Inc. is a Texas corporation whose operations are in Texas, and it owns and manages timeshare properties in Texas. Silverleaf sued appellants after they began contacting Silverleaf's customers. Silverleaf asserted claims for (1) intentional interference with existing contracts, (2) intentional interference with prospective business relations, (3) defamation, (4) business disparagement, and (5) civil conspiracy. NNA and Sussman filed a special appearance challenging personal jurisdiction that was denied by the trial court in an order signed on May 31, 2016. This interlocutory appeal followed.

## PERSONAL JURISDICTION

Texas courts may exercise personal jurisdiction over a nonresident defendant "when the state's long-arm statute authorizes such jurisdiction and its exercise comports with due process." *Cornerstone Healthcare Grp. Holding, Inc. v. Nautic Mgmt. VI, L.P.*, 493 S.W.3d 65, 70 (Tex. 2016). The Texas long-arm statute provides in relevant part that "in addition to other acts that may constitute doing business," a nonresident does business in Texas if the nonresident contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state, or if the nonresident commits a tort in whole or in part in this state. TEX. CIV. PRAC. & REM. CODE ANN. § 17.042(1), (2) (West 2015). The statute "provides for personal jurisdiction that extends to the limits of the United States Constitution, and so federal due process requirements shape the contours of Texas courts' jurisdictional reach." *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 66 (Tex. 2016).

"[W]hether a trial court's exercise of jurisdiction is consistent with due process requirements turns on two requirements: (1) the defendant must have established minimum contacts with the forum state; and (2) the assertion of jurisdiction cannot offend traditional

---

[2] The record does not indicate Sussman's current residence, but it is undisputed that he is a nonresident defendant.

notions of fair play and substantial justice." *Id*. (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "[S]ufficient minimum contacts exist when the nonresident defendant 'purposefully avails itself of the privilege of conducting activities within the forum [s]tate, thus invoking the benefits and protections of its laws.'" *Id*. at 66–67 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). "The nub of the purposeful availment analysis is whether a nonresident defendant's conduct in and connection with Texas are such that it could reasonably anticipate being haled into court here." *Id*. at 67. The defendant must purposefully direct contacts into the forum state. *Id*. (citing *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 228 (Tex. 1991)).

When determining whether a nonresident purposefully availed itself of the privilege of conducting activities in Texas, we consider three factors: (1) only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or third person; (2) the contacts relied upon must be purposeful rather than random, isolated, or fortuitous; and (3) the defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction. *Cornerstone*, 493 S.W.3d at 70–71. This analysis assesses the quality and nature of the contacts, not the quantity. *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 151 (Tex. 2013). A defendant will not be haled into a jurisdiction based solely on contacts that are random, isolated, or fortuitous, or on the unilateral activity of another party or a third person. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005); *Guardian Royal Exch.*, 815 S.W.2d at 226.

In addition to minimum contacts, due process requires the exercise of personal jurisdiction to comply with traditional notions of fair play and substantial justice. *Moncrief Oil Int'l,* 414 S.W.3d at 154 (citing *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009)). The evaluation is undertaken in light of these factors, when appropriate:

> (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate or international judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several nations or states in furthering fundamental substantive social policies.

*Spir Star AG v. Kimich*, 310 S.W.3d 868, 878 (Tex. 2010).

The plaintiff bears the initial burden of pleading allegations that suffice to permit a court's exercise of personal jurisdiction over the nonresident defendant. *Searcy*, 496 S.W.3d at 66. Once the plaintiff has met this burden, the defendant then assumes the burden of negating all potential bases for personal jurisdiction that exist in the plaintiff's pleadings. *Id*. The defendant can negate jurisdiction on either a factual or legal basis. *Kelly v. Gen. Interior Constr., Inc*., 301 S.W.3d 653, 659 (Tex. 2010). A defendant negates jurisdiction on a factual basis by presenting evidence to disprove the plaintiff's jurisdictional allegations. *Id*. "The plaintiff can then respond with its own evidence that affirms its allegations, and it risks dismissal of its lawsuit if it cannot present the trial court with evidence establishing personal jurisdiction." *Id*. (footnotes omitted). A defendant negates jurisdiction on a legal basis by showing that "even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas fall short of purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction." *Id*. A defendant's contacts with a forum may give rise to either general or specific jurisdiction. *KC Smash 01, LLC v. Gerdes, Hendrichson, Ltd., L.L.P.*, 384 S.W.3d 389, 392 (Tex. App.—Dallas 2012, no pet.).

Siverleaf does not argue general jurisdiction is available in this case. Our inquiry is therefore confined to specific jurisdiction, which is based on "whether the defendant's activities in the forum state themselves 'give rise to the liabilities sued on.'" *Searcy*, 496 S.W.3d at 67 (quoting *Int'l Shoe*, 326 U.S. at 317). Specific jurisdiction exists when the plaintiff's claims

"arise out of" or are "related to" the defendant's contacts with the forum. *Id*. (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 8, 9 (1984)). The defendant's relationship with the forum state, not the plaintiff's relationship, is the proper focus of the specific jurisdiction analysis. *Id*. Courts must consider the relationship between the defendant, the forum state, and the litigation. *Id*.

"'[F]or a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation.'" *Moncrief Oil Int'l,* 414 S.W.3d at 156 (quoting *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 585 (Tex. 2007)). "'[B]ut-for causation alone is insufficient.'" *Leonard v. Salinas Concrete*, LP, 470 S.W.3d 178, 188 (Tex. App.—Dallas 2015, no pet.) (quoting *Moncrief Oil Int'l,* 414 S.W.3d at 157). "'The operative facts are those on which the trial will focus to prove the liability of the defendant who is challenging jurisdiction.'" *Id*. (quoting *Kaye/Bassman Int'l Corp. v. Dhanuka*, 418 S.W.3d 352, 357 (Tex. App.—Dallas 2013, no pet.)). We analyze specific jurisdiction on a claim-by-claim basis, unless we are shown that all claims arise from the same contacts with Texas. *Moncrief Oil Int'l,* 414 S.W.3d at 150.

## STANDARD OF REVIEW

The question of whether a court has personal jurisdiction over a nonresident defendant is a question of law we review de novo. *Moncrief Oil Int'l,* 414 S.W.3d at 150 (citing *Moki Mac River Expeditions*, 221 S.W.3d at 574). "When, as here, the trial court does not issue findings of fact and conclusions of law, we imply all relevant facts necessary to support the judgment that are supported by the evidence." *Id*. (citing *Retamco Operating, Inc*., 278 S.W.3d at 337).

## FACTUAL BACKGROUND

The record includes numerous correspondence that was sent to Texas timeshare owners by appellants purporting to act on their behalf. Among that correspondence is a form letter from

a marketing firm, Aston Marketing Solutions, that was sent to timeshare owners all over the country, including Texas. The letter began by stating, "You now qualify for a permanent Maintenance Fee elimination" and "[a]ll of your future Timeshare Maintenance Fee bills may be permanently eliminated." The letter noted that "[w]e have attempted contacting you previously without success," and listed an area code 888 telephone number for the recipients to contact. NNA's name is not on the letter. The return address on the letter is a "Property Management Services" at an address on N. MacArthur Blvd. in Dallas, Texas.

In his deposition, Robert Sussman testified that he hired Aston and paid the firm approximately $60,000 to $80,000 per week for its services, and that he believed they had a verbal agreement.[3] Sussman explained that Aston had the timeshare owners' names and addresses and would write letters to timeshare owners all over the country, including Texas, inviting them to "call in" to Aston's "call center." Aston would attempt to sell them a product or service, providing customer names to companies like NNA and others that had contracted for its services. It would also book appointments for seminars in Texas—that Sussman said Aston controlled—to sell those products or services. Sussman described the terms of the verbal agreement with Aston as follows:

> Basically, the agreement was everything I mentioned about the procedure, that this is what they would do, and they would provide all the services that I mentioned, and that they would funnel customers into us. And it was our obligation to process the payments of Nevada National for the customers, and they would get a huge commission off of whatever was sold. And they would provide the call center services, too. The letters were mailed by them. They would take the inbound calls. They would book the customers. They would do everything.

NNA eventually obtained thirty-seven Texas timeshare owners as clients, eight of whom were Silverleaf timeshare owners. According to Sussman's testimony and the NNA

---

[3] Sussman testified that there was a draft of a written agreement that was never signed.

correspondence in the record, those eight Silverleaf Texas timeshare owners are as follows:

* Harold and Maureen Sloan

* Kenneth and Linda McCrary

* Kevin and Deborah Bredehoeft

* Laurent Pare

* Martin and Ramona Hauersperger

* Omer DeGrange

* Esther Marks, and

* Homer and Jane Smith.

Not all of these people were Texas residents. Of the eight Texas timeshare owners listed above, the Bredehoefts lived in Missouri, the Hauerspergers lived in Illinois, and Pare lived in Massachusetts. But Sussman believed that all of the Silverleaf customers became NNA clients as a result of Aston's efforts. He testified that NNA gained approximately $57,000 in revenue from the thirty-seven Texas timeshare owners. The record does not indicate how much of that revenue was attributable to the Silverleaf timeshare owners.

The "Contract-Resort Cancellation Program" agreement entered into between NNA and the Texas clients sets forth the mailing address for the client, and the client provided information regarding the timeshare, including its location. The contract with one Texas client, Omer DeGrange,[4] identified the residence as Springtown, Texas. DeGrange provided his deed showing he had an interest in a timeshare located in Smith County, Texas. The contract specified that the total fee paid by DeGrange for NNA's services was $2995. The agreement stated that "[b]y using Nevada National Adv., Inc. you will be able to enjoy the services we provide through our many contracted attorneys, accountants, real estate brokers and a wide variety of resort industry

---

[4] The contract also lists the name of Omer's wife, Patricia, but indicates that she is deceased.

professionals." "[I]n exchange for the onetime fee paid to Nevada National Adv., Inc.," the agreement continued, the client would receive "a fully licensed specialist that will assist in all necessary work, to accomplish the client's desired outcome: cancellation of client's resort membership/contract." The contract further stated that "[o]nce you become a client, you do not have to pay anymore maintenance bills, assessments, or dues, etc., to your resort," but the client was required to acknowledge that "they may be responsible for maintenance bills, taxes and any resort bills prior to signing and providing full payment to Nevada National Adv., Inc. for this agreement."

In addition to the contracts, the Texas clients also signed limited powers of attorney. The powers of attorney stated in part that the client, "of Texas as Grantor," appointed NNA as the attorney-in-fact for the limited and sole purpose of "[N]egotiating on my/our behalf to secure the release of any future obligations that I/we have with respect to my Resort/Club membership. . . ."

The Texas clients received letters from NNA welcoming them to the "Resort Cancellation Program." The letters were from an attorney, Chris Roberts, whose signature block read "Chris K. Roberts, Esq., Attorney at Law." He advised the clients that he had been assigned to assist NNA "in releasing you from your timeshare contract and from your future timeshare fees." The letters also stated that "[o]ur goal is to have you released now and forever from your timeshare contract. That means from this day forward you are in no obligation to pay any future fees. . . ." Roberts cautioned, "Should you receive any further contact from your timeshare resort please let me know immediately as this is in violation of the law." Sussman testified, however, that NNA never sent correspondence to Texas residents without first having been contacted by them.

Roberts testified in his deposition that he had interviewed with and was hired by Sussman after answering an ad in Craigslist for a full-time attorney or paralegal to write demand letters.

In his deposition, Sussman explained that NNA had contracted with attorneys in the state of Texas and other states in order to assist in negotiating with timeshare owners and operators. Sussman also testified that over the four years prior to his May 20, 2015 deposition, NNA had hired two different attorneys that were licensed in the state of Texas, and that NNA had an attorney of record in Texas in 2014, although he could not recall for how many months.

The record further shows NNA sent demand letters to Silverleaf on behalf of five Texas clients—the Bredehoefts, DeGrange, Marks, Pare, and the McCrarys—that listed each individual client's Silverleaf account number and informed Silverleaf that NNA had been hired to represent the clients "with respect to the above captioned matter." These demand letters specifically invoked Texas law, among other laws, stating that the NNA customers were "OUT as members of your organization, as of the date of this letter," and that this was pursuant to applicable Texas state or federal law. The letters demanded that Silverleaf "immediately terminate our clients' timeshare ownership/membership." The letters also invoked the Texas Fair Debt Collection Practices Act, among other statutes, stating that Silverleaf was prohibited from contacting the NNA clients, and demanding Silverleaf "not to contact our clients by any means." The letters were signed by "Chris K. Roberts," just above the signature block that read "Chris K. Roberts, Esq., Attorney at Law."[5] The demands were typically followed by a "Second Notice" that reminded Silverleaf thirty days had passed since the demand had been sent and that, "[s]ince 30 days have passed, we are assuming you have received our letter and released our client from the account and contract at your resort."

Silverleaf, in turn, notified NNA that it rejected NNA's demands to cancel the contracts and that should the clients elect to default, Silverleaf would have to proceed with foreclosure.

---

[5] The demand letter that was sent on behalf of Harold and Maureen Sloan was signed by a different attorney, "Douglas J. Petkoff, Esq., Attorney at Law," and invoked California and federal law.

However, Sussman recalled during his deposition that two NNA clients, Harold and Maureen Sloan, were voluntarily released by Silverleaf after NNA stopped working on their file and suggested they contact Silverleaf directly about their hardship.

In his deposition testimony, Roberts acknowledged that some incorrect statements were included in the demand letters he signed and sent to Silverleaf. He testified that he spoke to Sussman on multiple occasions about what should be included in the demand letters, and that Sussman would "change the formats" of the letters "and what was said." Roberts also testified that Sussman told him to include certain statements in the demand letters and that he did not know whether those statements were true. Still other statements were included—at Sussman's direction—when there was nothing in the client's file that indicated the statements were true, but Roberts acknowledged that Sussman may have had knowledge regarding information that was not in the file.

Three demand letters—written on behalf of the Silverleaf Texas timeshare owners Homer and Jane Smith and Omer DeGrange, and Silverleaf customers, Leo and Shirley Bourret—were written by Sussman. As with the other demand letters, the return address at the top of the letter was as follows:

> Nevada National Adv. Inc.
> 13465 Camino Canada Suite 106-464
> El Cajon, CA 92021-8814
> (866) 822-5564
> reply.nna@gmail.com

The letters were addressed to Silverleaf Resorts, and all three were written on behalf of Silverleaf customers who were NNA clients—just above the greeting was the name of the client and their Silverleaf account number. The first two paragraphs explained what NNA was and its relation to the timeshare owners at issue:

> Nevada National Adv. Inc. ("NNA") is a company which negotiates the release of contractual and real property time share obligations on behalf of its clients. NNA

–10–

is not a law firm. However, NNA at times engages legal counsel in various states in order to carry out its purposes.

NNA has been hired by the above-referenced individuals in order to secure their release from their time share obligations. They have given NNA power of attorney to represent them with respect to said release. A copy of said power of attorney is enclosed with this letter. Accordingly, please direct all further communications regarding this account to NNA.

The letter requested that Silverleaf agree to cancel the timeshare contract and, if applicable, prepare a deed for signature, and NNA would complete it on behalf of its client and return it to Silverleaf for recordation. Two of the demand letters were signed "Bob," just above the signature block for "Bob Sussman, President, National Advertising, Inc." The other letter, written on behalf of DeGrange, contained this same signature block but was unsigned.

NNA's Texas clients also received periodic "Cancellation Client Update" and "Client Update" letters reminding them that demand letters had been sent on their behalf to Silverleaf. The cancellation client update letters stated in part that "[t]he resort has received our legal request letter to permanently remove you from their client list," "Please advance your calendar 45 days from now," and that NNA anticipated "having our next update, in 45 more days, to be one that states 'Mission Accomplished.'" The client update letters stated in part as follows:

We have confirmed that the resort has received our legal request letter to permanently remove you from their owner list.

They tell us that it is in your best interest to STOP paying any fees to the resort and to refrain from any contact with Silverleaf. This means no more fees should be paid from you to them for 2014 or for future maintenance, assessments, or other bills. The resort will take back the account, by default.

The "Mission Accomplished" follow-up letters that some NNA clients received contained similar language as above, and the following paragraph:

We are considering this file completed/closed, however if you should receive any bills or any letters from them, please forward them to us at the above address with a cover letter stating your name and file number (s) and we will address the matter accordingly.

After Silverleaf received demand letters from NNA, the Texas owners stopped making payments

to Silverleaf and Silverleaf ceased communicating with the timeshare owners.

In an affidavit filed in support of appellants' special appearance, Sussman averred, in part, that he has never lived in Texas; has never done business in Texas; does not own real or personal property located in Texas; has never contracted with any person or entity in Texas; has not sold or purchased any products or services in Texas; has no employees in the state of Texas; is not an employee of anyone in Texas; and has never loaned any money to anyone in Texas.

## DISCUSSION

### A. Minimum Contacts

In two issues, appellants contend the trial court erred by denying NNA's and Sussman's special appearance because neither has sufficient minimum contacts with Texas, they did not purposefully avail themselves of the benefits of Texas law, the attenuated contacts attributed to them establish no meaningful connection with Texas, and all such contacts were random and fortuitous. Accordingly, haling them into court here would offend traditional notions of fair play and substantial justice. Appellants further argue that we should find a lack of jurisdiction over Sussman because he cannot be held personally liable for actions he took on behalf of NNA since those actions were undertaken in his corporate—not his individual—capacity.

### 1. NNA

Silverleaf alleged in its first amended petition that NNA and Sussman conducted business in Texas by entering into agreements with Texas residents performable in Texas and then acting for Texas residents in negotiating a release from their Silverleaf timeshares. Additionally, Silverleaf alleged NNA and Sussman intentionally interfered with Silverleaf's contracts with Texas residents and made false and defamatory statements regarding Silverleaf, a Texas-based company. Silverleaf also alleged that the torts NNA and Sussman committed in Texas—intentional interference with existing contracts, intentional interference with prospective

–12–

business relations, defamation, business disparagement, and civil conspiracy—were the result of their purposeful availment of the privilege of conducting business activities in Texas by soliciting Texas timeshare owners through mailings; entering into agreements with the Texas owners; disparaging Silverleaf to the Texas owners; and mailing correspondence to Silverleaf in order to negotiate their customers' release from timeshare payment obligations to Silverleaf.

Some facts are not in dispute. In response to Silverleaf's requests for admissions, NNA admitted the following:

* Its customers from January 1, 2010 through the present included "Texas Owners";

* It entered into contracts with individuals who own or have owned timeshares operated by Silverleaf Resorts, Inc. in Texas;

* It attempted to negotiate with Silverleaf on behalf of "Texas Owners";

* It sent mail to "Texas Owners";

* It entered into limited powers of attorney with individuals who own or have owned timeshares in Texas operated by Silverleaf Resorts, Inc., for the limited and sole purpose of authorizing NNA to negotiate on their behalf to secure the release of certain future obligations they may have had with respect to their timeshares operated by Silverleaf Resorts, Inc.;

* It received payments from "Texas Owners"; and

* It contacted Silverleaf in Texas to negotiate for "Texas Owners."

"[T]he mere sale of a product to a Texas resident will not generally suffice to confer specific jurisdiction upon our courts. Instead, the facts alleged must indicate that the seller intended to serve the Texas market." *Moki Mac*, 221 S.W.3d at 577. In this case, not only did appellants intend to serve the Texas market, but Silverleaf's causes of action arose from or are related to appellants' contacts with the forum. NNA and Sussman make much of the fact that, unlike the defendant in *Moki Mac*, neither of them purposefully directed any marketing efforts to Texas, advertised in Texas, or solicited Texans through a mailing list compiled by NNA or Sussman. According to NNA and Sussman, neither knowingly sold NNA's services to Texans:

–13–

rather they assert, it was Aston that compiled the names and addresses and mailed the letters to customers. NNA and Sussman contend the customers were contacted by Aston at its own call center. Aston attempted to sell the customers a product or service and gave the customers the names of outside companies, like NNA, that had contracted for Aston's services. As a result, NNA and Sussman assert neither contacted Texas residents without first having been contacted by them.

The record, however, also shows that NNA hired Aston to send letters to timeshare owners in Texas and other states for the specific purpose of doing business with them. As Sussman explained in his deposition, NNA contracted with Aston "because we want[ed] customers that are in need of us helping them." And after it obtained the names of timeshare owners in Texas, NNA established channels of regular communication to those timeshare owners, i.e., entering into contracts and powers of attorney with them; sending them regular communication via "welcome" letters and "client update" letters; and sending Silverleaf demand letters on their behalf that specifically invoked Texas law. Several of the demand letters were written by Sussman. *See Asahi Metal Ind. Co. v. Superior Court*, 480 U.S. 102, 112 (1987) (examples of additional conduct that may indicate whether defendant purposefully availed itself of a particular forum include advertising and establishing channels of regular communication to customers in forum state). In other words, unlike the one-time, fortuitous transaction between the seller and the Texas resident in *Michiana*, *see Michiana*, 168 S.W.3d at 786, NNA intended to serve the Texas market. We also note that the form letter from Aston that is in the record shows a return address in Dallas, Texas,[6] and the record also shows that Aston contacted Texas

---

[6] Silverleaf contends Aston is a Texas-based company. But according to an excerpt of Sussman's deposition testimony that is appended to appellants' reply brief, it is located in Torrance, California. Appellants explain that these pages of Sussman's deposition were not at issue before the trial court and were not attached to any pleadings. The attachment of documents as exhibits or appendices to appellate briefs is not formal inclusion in the record on appeal and, therefore, such documents should not be considered. *Perry v. Kroger Stores*, Store No. 119, 741 S.W.2d 533, 534 (Tex. App.—Dallas 1987, no writ). But even if we were to consider the deposition excerpt and resolve the dispute in appellants' favor, it is not dispositive of the jurisdictional issue given NNA's other contacts with the forum.

–14–

residents via not only direct mail to Texas residents but though seminars held in Texas. Even if appellants are correct that neither NNA nor Sussman contacted Texas residents without first having been contacted by them, that alone does not negate specific jurisdiction. Although a defendant may not be haled into a jurisdiction solely as a result of the "unilateral activity of another party or a third person," jurisdiction is proper "where the contacts proximately result from actions by the defendant himself that create a 'substantial connection' with the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (citations and internal quotations omitted). Such is the case here. By purposely choosing Aston to solicit customers that were in need of its services, which in turn directed marketing efforts towards Texas residents, and then establishing regular channels of communication with the customers it obtained through Aston's efforts, NNA should have been aware of the possibility that it would be haled into court here.

Because Silverleaf alleges that NNA's and Sussman's minimum contacts give Texas specific, rather than general, jurisdiction over them, we must also determine whether Silverleaf's causes of action arose out of or are related to NNA's and Sussman's purposeful contacts with Texas. *See Searcy*, 496 S.W.3d at 67 (citing *Helicopteros Nacionales de Colombia*, 466 U.S. at 414 n. 8). We resolve this question by noting, first, that NNA's contacts with Texas that show purposeful availment of the benefits of doing business here are among the operative facts of the litigation:

> * Hiring a third-party vendor that solicited owners of timeshare interests in Texas properties via both direct mail and seminars held in Texas;
>
> * Obtaining thirty-seven Texas clients as a result of Aston's solicitation efforts, eight of whom were Silverleaf customers;[7]

---

[7] Appellants argue that only the Silverleaf clients of NNA are relevant for purposes of our jurisdictional analysis. Appellee maintains we must analyze the totality of appellants' activities in Texas and their relationship to the plaintiff's claims, including all thirty-seven owners of

–15–

* Entering into contracts with the Silverleaf customers, under which NNA agreed to negotiate with Silverleaf on behalf of the owners of timeshare interests in Texas;

* Entering into powers of attorney with the Silverleaf owners of timeshare interests in Texas, under which NNA was authorized to negotiate directly with Silverleaf.

* Sending letters to the Silverleaf timeshare owners welcoming them to the "Resort Cancellation Program," stating in part that "[o]ur goal is to have you released now and forever from your timeshare contract," and that "from this day forward you are in no obligation to pay any future fees";

* Sending demand letters to Siverleaf that specifically invoked Texas law; and

* Employing an attorney licensed to practice law in Texas.

Furthermore, in order to prove its claim for tortious interference with existing contracts, Silverleaf would have to show that the defendants, directly or through third party vendors or independent contractors, contacted and/or solicited the Silverleaf timeshare owners with the intention of inducing or causing them to breach their contracts with Silverleaf. Silverleaf's other claims are based on the same forum contacts. *See Sutton v. Advanced Aquaculture Sys., Inc.*, 621 F. Supp. 2d 435, 442 (W.D. Tex. 2007) (when separate claims are based on the same forum contacts, a separate analysis of each claim is not required); *see also Touradji v. Beach Capital Partnership, L.P.*, 316 S.W.3d 15, 26 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *Davis Invs., L.P. v. Holtgraves*, No. 14–08–00222–CV, 2009 WL 975961, at *12 n. 7 (Tex. App.—Houston [14th Dist.] Feb. 26, 2009, pet. denied) (mem. op.). Since the facts surrounding NNA's contacts with the Silverleaf timeshare owners—the crux of the purposeful contacts with Texas—will also be the focus of the claims against it, we conclude those claims arise out of or are related to NNA's Texas contacts.

There is, thus, a sufficient basis to conclude that a substantial connection exists between

timeshare interests in Texas. Because we conclude the evidence establishes minimum contacts between NNA and the state of Texas based on the Silverleaf clients, we need not resolve this dispute.

the claims in this case and NNA's purposeful contacts with Texas. *See Touradji*, 316 S.W.3d at 29–32 (claims brought by Texas resident with ownership interests in Texas limited partnership against New York resident were substantially related to defendant's purposeful contacts with Texas; court noted that contacts were not result of unilateral acts of a third party; defendant's contacts were not "random, isolated, or fortuitous;" and defendant sought benefits, advantages, and profits through his purposeful availment of Texas); *Preussag Energie GMBH v. Well Constr. Teams, Inc.*, No. 14–00–00423–CV, 2000 WL 1862810, at *5 (Tex. App.—Houston [14th Dist.] Dec. 21, 2000, no pet.) (not designated for publication) (when non-resident knowingly induces Texas resident to breach its contract with another Texas resident, it is "eminently foreseeable and reasonable that a corporation facing the above-discussed allegations of intentional conduct directed at Texas and Texas residents, causing injury in Texas, and causing litigation between Texas residents should expect to be haled into a Texas court to answer for that conduct"). Accordingly, the evidence establishes minimum contacts between NNA and the state of Texas.

### 2. Robert Sussman

As for Sussman, Silverleaf's first amended petition alleged that he:

* Was the central figure in NNA's corporate activities that gave rise to Silverleaf's claims in this case;

* Was the sole officer and owner of NNA;

* Was paid most if not all NNA's profits;

* Was responsible for developing NNA's strategy for assisting NNA's Texas customers to breach their contractual obligations to Silverleaf;

* Caused NNA to enter into an agreement with a third-party vendor under which it solicited Texas residents to become NNA customers through direct mailings, resulting in some of those residents becoming NNA customers;

* Personally solicited Texas residents to become NNA customers;

* Knew that the vendor's solicitation efforts would be directed to Texas residents;

* Vetted, hired, and advised or supervised, a network of attorneys and customer-

–17–

service representatives to work directly with Texas residents to assist them in avoiding their contractual obligations to Silverleaf;

* Hired at least one attorney licensed to practice law in Texas to assist NNA customers;

* Caused NNA to enter into powers of attorney with Texas residents to enable the NNA attorneys and customer service representatives to negotiate directly with Silverleaf on behalf of Texas residents;

* Caused NNA to enter into service contracts with Texas residents in which NNA represented that the Texas residents were no longer required to make payments to Silverleaf;

* Caused NNA to send letters to Texas residents advising them to cease making payments to and communicating directly with Silverleaf and informing the Texas residents that it was in their best interest to stop making payments to Silverleaf;

* Caused NNA, through attorneys or customer service representatives hired and trained by Sussman, to send letters to Silverleaf telling it to stop communicating directly with NNA clients or risk violating Texas law; and

* Drafted, was responsible for, or approved, the statements included in the powers of attorney, service contracts, and letters to Texas residents or Silverleaf.

Relying on the fiduciary shield doctrine, Sussman argues he cannot be individually haled into a Texas court because he acted exclusively in his corporate, not his individual, capacity. But the general rule is that a corporate employee is not shielded from the exercise of specific jurisdiction as to torts for which the employee may be held individually liable. *See Stull v. LaPlant*, 411 S.W.3d 129, 137 (Tex. App.—Dallas 2013, no pet.); *see also Jani-King Franchising, Inc. v. Falco Franchising*, *S.A*., No. 05–15–00335–CV, 2016 WL 2609314, at *2 (Tex. App.—Dallas May 5, 2016, no pet.) (mem. op.). This is because a corporate officer is primarily liable for his own torts. *Morris v. Powell*, 150 S.W.3d 212, 221 (Tex. App.—San Antonio 2004, no pet.). "There is no blanket protection from jurisdiction simply because a defendant's alleged acts were done in a corporate capacity." *SITQ E.U., Inc. v. Reata Rests., Inc*., 111 S.W.3d 638, 651 (Tex. App.—Fort Worth 2003, pet. denied). "Thus, a corporate officer is not protected from the exercise of specific jurisdiction, even if all his contacts were

performed in a corporate capacity, if the officer engaged in tortious or fraudulent conduct directed at the forum state for which he may be held individually liable." *Tabacinic v. Frazier*, 372 S.W.3d 658, 668–69 (Tex. App.—Dallas 2012, no pet.) (citing *Ennis v. Loiseau*, 164 S.W.3d 698, 707 (Tex. App.—Austin 2005, no pet.)). "A corporate officer may not escape liability where he had direct, personal participation in the wrongdoing, as to be the 'guiding spirit' behind the wrongful conduct' or the 'central figure' in the challenged corporate activity.' " *Ennis*, 164 S.W.3d at 707 (quoting *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 174 (5th Cir. 1985)). Hence, the general rule in Texas that corporate agents are individually liable for fraudulent or tortious acts committed while in the service of the corporation. *Id*. (quoting *Shapolsky v. Brewton*, 56 S.W.3d 120, 133 (Tex. App.—Houston [14th Dist.] 2001, pet. denied)).

Two prior decisions from this Court, *Stull* and *Tabacinic*, are instructive in this regard. In *Stull*, the defendants, Greg LaPlant and Chris Kolaskos, were residents of California and were executives of RSP Talent, Inc. which had its principal place of business in California. *Stull*, 411 S.W.3d at 132. RSP Talent, Inc. contracted with the plaintiffs to provide an "Official Penthouse Super Bowl Party" in Dallas, Texas, on the Friday and Saturday nights immediately preceding Super Bowl XLV. *Id*. at 133. The plaintiffs filed suit in Texas alleging, in part, that RSP Talent, LaPlant, and Kolaskos had breached the agreed terms of the contract. *Id*. LaPlant and Kolaskos filed a special appearance supported by affidavit in which they stated that neither LaPlant or Kolaskos had contact with the state of Texas except as corporate agents acting on behalf of RSP. *Id*. at 133, 136. The plaintiffs admitted the defendants' only contacts with Texas were solely in their capacities as executives of RSP. *Id*. at 138. The only personal contact alleged in support of specific jurisdiction was an agreement to pay the plaintiffs a $5,000 direct commission or brokerage fee as part of the transaction, but as we noted in our opinion, this alleged payment was for work the defendants did in their representative capacity for RSP. *See id*. We concluded

LaPlant and Kolaskos's contacts with the Texas acting as corporate agents for RSP Talent did not satisfy the minimum contacts necessary to support jurisdiction here over LaPlant and Kolaskos. *Id.*

In *Tabacinic*, William and Veronica Frazier, Texas residents, filed suit for fraudulent inducement, negligent misrepresentation, and breach of warranty against Florida-based defendants, Moris and Lillian Tabacinic, following a dispute over the plaintiffs' purchase of real property in Texas. *Tabacinic*, 372 S.W.3d at 662. The defendants did not have a residence, maintain an agent, a place of business or real or personal property in Texas, had never paid taxes in Texas, and had only been to Texas twice for personal reasons. *Id.* at 667. They also never met the plaintiffs and did not communicate with them via telephone or correspondence. *Id.* The trial court denied their special appearance, and the defendants appealed, arguing against jurisdiction in Texas because they acted exclusively in their corporate capacity and the plaintiffs had failed to pierce the corporate veil. *Id.* We affirmed, concluding it was the defendants' own actions attributed to them individually, not the actions of the corporation, that subjected them to jurisdiction. *Id.* at 669–70. These actions included misrepresentations made in the contract entered with the plaintiffs that concerned activity related to Texas real property, sold to Texas residents, and to occur in Texas. *Id.* at 667, 670–71.

The record in this case shows Sussman is the sole officer and owner of NNA, and the beneficiary of its profits. He entered into the oral agreement between Aston and NNA under which Aston contacted Texas residents via direct mail and seminars held in Texas. He did this because NNA wanted customers that were in need of its services. As a result of these marketing efforts, thirty-seven Texas timeshare owners eventually became NNA customers, eight of whom were Silverleaf timeshare owners. Sussman vetted and hired attorneys, including Chris Roberts, that wrote various "welcome" and "client update" letters to the Siverleaf timeshare owners on

NNA's behalf. They also wrote demand letters to Silverleaf on behalf of NNA clients who were Silverleaf customers. These letters informed Silverleaf that the NNA customers were "OUT" as Silverleaf timeshare owners and all future communications between the Texas residents and Silverleaf should be through NNA, and that their timeshare ownership/membership should be immediately terminated. At least one of the attorneys Sussman hired was licensed in Texas. The record also shows Sussman was heavily involved in writing and editing the demand letters that were sent to Silverleaf. According to Roberts, he spoke to Sussman on multiple occasions about what should be included in the demand letters he wrote to Silverleaf, and Sussman would "change the formats" of the letters "and what was said." As Sussman stated in his deposition when pressed about his knowledge regarding "what correspondence is going where on behalf of Nevada National," "I have a general idea of everything that goes on at Nevada National," though he did not "micromanage" anyone. Sussman wrote three of the demand letters to Silverleaf that were sent on behalf of Silverleaf timeshare owners who were NNA clients. The demand letters were instrumental in NNA's overall strategy to cause Silverleaf timeshare owners to default on their payment obligations to Silverleaf until Silverleaf foreclosed. Additionally, these are the facts on which Silverleaf's allegations against Sussman are based.

As in *Tabacinic*, it is Sussman's own conduct that subjects him to jurisdiction in Texas. Silverleaf has alleged torts for which Sussman—the sole officer and owner of NNA, and the beneficiary of its profits—can be held individually liable, e.g., he was "guiding spirit" or "central figure" in NNA's interference with Silverleaf's contracts with its timeshare customers. *See Tabacinic*, 372 S.W.3d at 669–70. Indeed, Sussman is potentially liable on an individual basis for all of Silverleaf's claims, which sound in tort, assuming Silverleaf can prove its allegations against him. As we noted earlier, the fiduciary shield doctrine does not protect Sussman from the exercise of specific jurisdiction, even if all of his contacts with Texas were performed in a

corporate capacity, if he "engaged in tortious or fraudulent conduct, directed at the forum, for which he may be held personally liable." *Ennis*, 164 S.W.3d at 705. Thus, the fiduciary shield doctrine will not protect Sussman from the exercise of specific jurisdiction in this case if personal jurisdiction is otherwise proper. *See Stull*, 411 S.W.3d at 137; *Jani-King*, 2016 WL 2609314, at *2. Because Sussman will be personally liable if Silverleaf successfully proves its allegations against him, and because the evidence establishes minimum contacts between Sussman and the state of Texas, he cannot hide behind the corporate shield and is therefore subject to in personam jurisdiction in Texas.

### B. Fair Play and Substantial Justice

Having determined that NNA and Sussman have minimum contacts with Texas, we turn to whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice, as due process requires. *Cornerstone*, 493 S.W.3d at 74. The Texas Supreme Court has recognized that "[i]f a nonresident has minimum contacts with the forum, rarely will the exercise of jurisdiction over the nonresident not comport with traditional notions of fair play and substantial justice." *Moncrief*, 414 S.W.3d at 154–55.

This is not one of those rare occurrences. As to the first factor, *see Spir Star AG*, 310 S.W.3d at 878, the burden on the nonresident defendants, NNA and Sussman argue that upholding the trial court's exercise of personal jurisdiction over them would offend due process because it would drag them from their residence to a state that has no special interest in the litigation, and it would not be the most efficient resolution of the controversy. However, "distance from the forum is generally not sufficient to defeat jurisdiction because the availability of 'modern transportation and communication have made it less burdensome for a party sued to defend himself in a state where he engages in economic activity.'" *Paul Gillrie Inst., Inc v. Universal Computer Consulting, Ltd.*, 183 S.W.3d 755, 764 (Tex. App.—Houston [1st Dist.]

2005, no pet.) (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)). "Unwelcome travel and expense" alone are not determinative. *Id.* "Litigation away from home creates hardship for a defendant," but "there is no legal requirement that this hardship must be borne instead by the plaintiff whenever the defendant is not found in the state of the plaintiff's residence." *Wright v. Sage Eng'g, Inc.*, 137 S.W.3d 238, 253–54 (Tex. App.—Houston [1st Dist.] 2004, pet. denied), *abrogated on other grounds by Michiana*, 168 S.W.3d at 788–92, *as recognized in Julian v. Cadence McShane Constr. Co. Inc.*, No. 01–15–00465–CV, 2015 WL 6755616, at *7 (Tex. App.—Houston [1st Dist.] Nov. 5, 2015, no pet.) (mem. op.). The record also reflects purposeful contacts by the appellants with Texas, and based on the quality, nature and extent of their contacts, they should expect to be called into the courts of Texas. Regarding the second and third factors, Texas courts have an interest in adjudicating the claims of Texas residents, and Texas is a convenient forum for the litigants. Litigation in Texas will provide all parties, not just appellee, the benefits and protections of our laws. The fourth factor is the interstate judicial system's interest in obtaining the most efficient resolution of the controversy. This interest will be served by litigation in Texas, where most of the Silverleaf timeshare owners are located. The fifth factor, the shared interest of other states in furthering fundamental substantive social policies, can be implemented by Texas courts as effectively as the courts of California or Nevada. Accordingly, we conclude that exercising personal jurisdiction over NNA and Sussman comports with traditional notions of fair play and substantial justice, and we overrule appellants' first and second issues.

The order of the trial court is affirmed.

/Lana Myers/
LANA MYERS
JUSTICE

160694F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

NEVADA NATIONAL ADVERTISING, INC., AND ROBERT SUSSMAN, Appellants

No. 05-16-00694-CV     V.

SILVERLEAF RESORTS, INC., Appellee

On Appeal from the 298th Judicial District Court, Dallas County, Texas
Trial Court Cause No. DC-14-13688.
Opinion delivered by Justice Myers. Justices Francis and Fillmore participating.

In accordance with this Court's opinion of this date, the order of the trial court is **AFFIRMED**. It is **ORDERED** that appellee SILVERLEAF RESORTS, INC. its costs of this appeal from appellants NEVADA NATIONAL ADVERTISING, INC., AND ROBERT SUSSMAN.

Judgment entered this 17th day of February, 2017.